**STATE of Iowa, Appellee,**

v.

**Clarence D. PEDERSEN, Appellant.**

**No. 64625.**

Supreme Court of Iowa.

Aug. 26, 1981.

Rehearing Denied Sept. 17, 1981.

Troyce A. Wheeler, Gary K. Anderson, and Richard H. Gross, Council Bluffs, for appellant.

Thomas J. Miller, Atty. Gen., Julie F. Pottorff, Asst. Atty. Gen., and David E. Richter, Pottawattamie County Atty., for appellee.

Considered by LeGRAND, P. J., and UHLENHOPP, HARRIS, McCORMICK, and LARSON, JJ.

UHLENHOPP, Justice.

The question in this appeal from a first-degree murder conviction is whether defendant Clarence D. Pedersen was mentally competent to stand trial.

Defendant has a history which includes residences in mental institutions, use of controlled substances, mutilation of livestock, and a nomad existence. The State's psychiatrist, Paul L. Loeffelholz, M. D., diagnosed defendant as having a schizoid personality disorder. The diagnosis of defendant's psychiatrist, George A. Young III, M. D., is schizophrenia, simple or chronic undifferentiated type.

Mr. and Mrs. Clarence Pedersen, Sr. are substantial farmers in southwest Iowa. Defendant, their son, had been working as a farm hand for them. They had a daughter, Mrs. Kent M. Nelson, who was terminally ill with cancer.

Defendant liked to hunt, and did so on the day of December 30, 1978. That evening Kent Nelson visited his hospitalized wife, and then came to the Pedersen home. The jury could find that Mrs. Pedersen arose from bed and that she and defendant briefly conversed with Nelson. Mrs. Pedersen returned to bed and Nelson apparently retired to a sleeping bag before the fireplace in the living room.

Sometime after Mrs. Pedersen fell asleep, a loud explosion aroused the household. Mr. and Mrs. Pedersen left their bed, and as they moved down the hall toward the explosion they met defendant emerging from his bedroom. He was clothed, but his habit was to remove only his boots on retiring.

On reaching the living room, Mrs. Pedersen heard a gurgling sound, felt a cold draft, noticed that the front door was ajar, and closed it. Mr. Pedersen and defendant found Nelson bleeding from a wound to the head. The authorities were called, and Mr. Pedersen and defendant went to the highway to direct the ambulance to the house.

Mr. Pedersen told the officers he found a shotgun shell by Nelson when he first observed him, picked it up, and then put it down where he thought he had found it. At some point he also noted that several guns in defendant's room were not in their cases; he smelled one but it did not appear to have been recently fired. An officer testified at the subsequent trial that when he initially checked defendant's room, all guns but one were in their places. He found that one gun in a case and testified it smelled as if it had recently been fired.

Later that morning officers conducted nitrate tests on the hands of Nelson, defend-

ant, Mr. Pedersen, and another son, Dan, who apparently was not at home at the time of the incident. Only defendant had significant elements of gunpowder on his hands. Evidence was introduced at trial that the shell Mr. Pedersen testified he found was consistent with having been fired in the gun the officer testified he found in defendant's room.

Defendant consistently denied throughout the investigation that he shot Nelson. He did not, however, present any evidence at trial of his version of the occurrence or of anything else.

Defendant was charged with murder. The public defender was appointed to represent him. The defender moved for a psychiatric examination of defendant. The district court appointed Dr. Loeffelholz of the Iowa Security Medical Facility, and defendant was examined there. Dr. Loeffelholz was of the opinion that defendant was not insane at the time of the alleged murder and that he was competent to stand trial.

The defender requested further psychiatric examination, and the court appointed Dr. Young to make it. Dr. Young did so, and concluded that defendant was not insane at the time of the alleged murder but that at the time of examination defendant was not competent to stand trial. In his opinion defendant appreciated the murder charge and understood the proceedings, but defendant could not assist effectively in his defense as a result of a mental disorder. In Dr. Young's view, defendant had pronounced negativism and also a delusion that his case had to be dismissed if not tried within thirty days—which had passed—and this combination prevented defendant from assisting or indeed from accepting counsel. Dr. Young thought that defendant should receive a period of treatment to see if he could be brought to a condition of accepting and assisting counsel.

The defender moved the court to suspend trial on the charge and to determine defendant's competency. The district court, Martin, J., held a hearing and took pains to see that the parties had the opportunity to bring out the evidence on competency. Psychiatric and psychological reports were introduced, and both psychiatrists testified. The court found defendant competent to assist counsel effectively, and set the case for trial.

Since the court found defendant competent and since defendant, insisting that the trial had to occur within thirty days, refused counsel, the public defender could represent him no longer. *Faretta v. California*, 422 U.S. 806, 835–36, 95 S.Ct. 2525, 2541, 45 L.Ed.2d 562, 581–82 (1975). The trial court nonetheless had the defender sit in the courtroom, in the event defendant would at some point accept help. The court endeavored at length to persuade defendant to accept counsel, and pointed out the dangers of trial without counsel. But defendant adamantly refused, repeating that the thirty-day time limit had expired.

Trial went forward. Defendant, being of low normal intelligence and without legal training or counsel, made no defense. He did not participate in questioning witnesses, objecting, presenting evidence, requesting jury instructions or objecting to instructions, or arguing to the jury. At the end of the State's evidence defendant made the statement, "I don't think they found who done it yet," which the court took as a motion for directed verdict, and overruled. The court treated defendant with patience and consideration, offering him counsel and also the opportunity to participate personally. Defendant steadfastly maintained that the trial had to occur within thirty days. The trial thus consisted substantially of the State's evidence and arguments.

The following excerpts are illustrative of the record. Defendant responded to a question at one point:

> The Court: And what I am trying to get at is you know there are certain rules that we follow in a trial and if you are not familiar with those rules it puts you to a great disadvantage in a trial.
>
> Defendant: Well, the way I figure trial is already wrong so I will just go by that.
>
> The Court: In what way is the trial wrong?

Defendant: Because trial was supposed to be held in 30 days in the first place and you missed it.

This colloquy occurred at another point:

The Court: But what I am trying to get at is this. You will be at a terrific disadvantage if you don't have somebody to help you or advise you at this trial because in order that you can follow the rules and examine the witnesses or see what the witnesses have to say and question the witnesses because that is a part of your defense; to be confronted by the witnesses in this case. And also as to the selection of the jury and any arguments that you would wish to make. Now, I want you to understand that this trial, this procedure we are going through at this trial is no different than the procedure we go through with any other party that is charged with an offense or with a crime and you are not presumed to be guilty of this. You are presumed to be innocent of this charge until the State proves their case against you. The point I am trying to get at is if the State is here with their attorneys to prove their case, which they have to do, that's their duty to try to prove it or disprove it. And you would be at a terrific disadvantage to not have somebody assist you in your defense.

Defendant: Well, I don't know. But that deal about rules, I mean this place don't follow the rules and I don't know, I will just go on. I will just go on with that trial whenever you set it.

The Court: It makes it very difficult to have you not represented because this is a very serious offense you are charged with as you realize; do you not?

Defendant: Well, this place is charged with just a serious one for holding me for so long.

And this:

Mr. Hrvol [prosecutor]: Mr. Pedersen, you can recall a hearing either in the courtroom or from somebody else, that if you weren't brought to trial within 90 days, I believe it was the proper amount of time from the filing of the indictment against you, that then you would be set free; isn't that true? Somebody told you this or you heard that somewhere. If you weren't brought to trial within a certain amount of time you would be set free.

Defendant: Yeah.

Mr. Hrvol: That rule is part of the procedure the judge was talking about; and you heard this probably from the lawyer.

Defendant: I was told that upstairs and they wouldn't release me.

Mr. Hrvol: And they heard it from a lawyer and it was a lawyer who told them that that rule was that they had to let you go if they didn't try you in a certain amount of time.

Defendant: Yeah.

Again:

The Court: If we did not continue with this matter and have a trial that you will have to remain in jail here until we can have a trial or otherwise dispose of it, and you have been in jail quite a spell already.

Defendant: Well, that's not my fault that you guys—the time limit don't work.

The Court: But now that the time limit has been disposed of and if it hasn't worked now it's up to the Court in fairness to you to fix the time for trial and to set a time for trial and to have a trial.

Defendant: My fairness time passed.

At one point in the trial defendant made this outburst in connection with his father and mother:

Defendant: Can I ask you something? How come I'm in the same Court that when I used to live way over on College Road and you came in my barn over on College Road or something, and you pressed a service call on me, how come that same service call is upstairs right now, and he's a queer?

Mr. Pedersen: I didn't.

Defendant: She took me there and that's what this is all about as far as I'm concerned.

Mr. Rodenburg [prosecutor]: Maybe the Court would ask the Defendant in the

presence of everybody here if he wishes to speak to his parents?

Defendant: No, that's all right. If I gotta—if I gotta go through a big deal of, I ain't got to say—

Mrs. Pedersen: I didn't.

Defendant: You what? What? You, oh, damn liars.

The Court: Well, I want to personally ask you, Dean, do you have any desire to talk to your father or your parents about the information they believe they have that would aid you in your defense?

Defendant: Well, I got a—I got another service call offering the other night on soybeans.

The Court: You are not answering my question. I am asking you whether or not you will talk to your parents about information that they have, and particularly your father, who says he has some information he would like to talk to you about that will aid in your defense.

Defendant: Aid in my defense?

The Court: Or help you—

Defendant: Them are direct enemies if you ask me. (Laughter.)

The Court: Who?

Defendant: Those queers. (Laughter.)

The Court: We are not talking about—

Defendant: That's exactly what they are. Ain't that what you referred me to about twenty-five years ago, it was a queer in town somewhere, and she hauled me in and now he's upstairs pressing service calls again on soybeans instead of cows. And every one of my cows are gone, too. And now all my soybeans are gone cause I'm in here and I'm getting a strip, spray soak down for my soybeans and I got a finger bang fuck for my cows.

The Court: Do you want the Court to infer from what you have said that you do not want to talk to your parents about the information that your dad talked about here, or that he has in his possession to talk to you about this case?

Defendant: I don't care, I don't care. I'll hear his defense if he's got any.

The Court: Do you want to talk to him privately and—

Defendant: No. Let him bring it out. Every time I get attacked, I get attacked through some communistic method like jumping through, jumping in my barn door and pressing a service call on me for all my cows again, and then ringing the telephone, having her pick it up, haul me to town for my cows and then being in town here, and when I'm in town locked up, all my crops and everything get stolen by another service call. By the same guy. Next I'll probably get a land call. I probably already got that and don't even know it.

The Court: We are not talking about—

Defendant: Like Daniel and Mike, right?

Mrs. Pedersen: I didn't.

Defendant: You what? Oh, you damn liars.

After this outburst the public defender sought permission from defendant to move for a mistrial based on defendant's incompetency to assist in his defense. Defendant refused:

Defendant: Well, I—I just as soon you know, just keep going like we're going and if the jury says—comes and says—starts saying they don't know what to do either, then, then there's no answer, I'll have to waive my thirty days rights and—

The Court: Do you intend me to interpret from what you are saying that you don't want this Motion filed or you do want it filed?

Defendant: Well, I—I don't want it filed. I just as soon finish it today.

The Court: All right.

After the jury returned the guilty verdict, defendant made these statements among others:

The Court: Is there any statement that the Defendant himself chooses to make?

Defendant: Well, just that you say stuff and it's wrong.

The Court: Anything else, sir?

Defendant: No, so I'd like—except I'd like to have another Judge sentence me if there is one cuz I don't want a liar sentencing me.

The Court: Do you have anything else you wish to say in regard to your allegations to the Court?

Defendant: Just not to hear any more from you.

Also:

Defendant: Can I ask you something? Who got murdered?

The Court: The Defendant will be given—

Defendant: Hold it, hold it, hold it. Get who I murdered out of him. I betcha—

Bailiff: Quiet down.

Defendant: Hold it. Who did I murder?

The Court: Young man—

Defendant: Who did I murder? I don't care. If you are sentencing me to life you're gonna tell me who I murdered. Hurry up, tell me.

The Court: The Defendant will be—

Defendant: Tell me—you don't even know what murder is, do you? Trying to buy off a bunch of ladies, man. You're just trying to win the other side and you know it's wrong, don't cha? You know, you know—ha, ha-ha. You just keep saying murdered, who got murdered, huh? Who got murdered, you can at least tell me that, who got murdered?

The Court: I'm not going to enter into any dialogue—

Defendant: How come he sentenced me when he don't even know who I murdered?

Bailiff: He didn't say you did, the jury did.

Defendant (to Bailiff): Get out of here.

The Court: Young man, either control your emotions, or I'll have them controlled for you.

Defendant: Okay, how can you keep saying I'm sentenced to murder when I didn't even murder? You don't even know who you're—you don't even know who you are charging me to murder with, do you? Just come right out and tell me who did I—what—who am I charged for murder with?

The Court: You are charged with murdering Mr. Nelson and a jury of twelve people decided that you did it.

Defendant: Murder is killing a girl. There.

And this:

The Court: Do you wish to poll the jury, Mr. Pedersen?

Defendant: I just think they should stay the release and not arrest me of the trial to me after thirty days.

The Court: The question that I am addressing to you now is whether or not you wish to ask each of the jurors if this is their verdict?

Defendant: No, I'm—that's enough for me.

After the jury returned a guilty verdict, defendant accepted the public defender as counsel. Following sentence to life imprisonment, defendant appealed.

In this appeal defendant raises several issues but we find one of them to be determinative: whether defendant was competent to assist counsel effectively in defense to the charge.

■ I. A criminal trial of a person who is incompetent to undergo trial deprives him of due process of law. *Drope v. Missouri*, 420 U.S. 162, 172, 95 S.Ct. 896, 904, 43 L.Ed.2d 103, 113 (1975). This means that we must evaluate the totality of the circumstances on the competency question. *State v. Lyon*, 293 N.W.2d 8, 12 (Iowa 1980); *State v. Kempf*, 282 N.W.2d 704, 707 (Iowa 1979). If we considered only the pretrial proceedings and closed our eyes to the trial evidence, we would ignore realities. *Cf. Kempf*, at 710 ("We would have to wear blinders to review the transfer decision only on the basis of the information disclosed in the transfer hearing. It would be unrealistic to do so."). The situation is different from *State v. Jackson*, 305 N.W.2d 420, 425 (Iowa 1981) (court found the defendant competent; the defendant subsequently moved to reconsider; "there was no additional evidence and no claim her condition had changed in the intervening thirty-four days"). Here abnormal incidents and

delusions occurred after the initial competency hearing and order, and the defender attempted to make a mistrial motion and did make a new-trial motion which was overruled. We must thus examine the competency question anew.

The governing statute on this subject now provides in sections 812.3 to 812.5, The Code 1979:

812.3. If at any stage of a criminal proceeding it reasonably appears that the defendant is suffering from a mental disorder which prevents him or her from appreciating the charge, understanding the proceedings or assisting effectively in the defense, further proceedings must be suspended and a hearing had upon that question.

812.4. If, upon hearing conducted by the court, the accused is found to be incapacitated in the manner described in section 812.3, no further proceedings shall be taken under the complaint or indictment until the accused's capacity is restored, and, if his or her release will endanger the public peace or safety, the court must order him or her committed to the custody of the department of social services.

812.5. If the accused is committed to the department of social services, after the expiration of a period not to exceed six months, the court shall upon hearing review the confinement and determine whether there is a substantial probability the prisoner will regain capacity within a reasonable time. If not, the state shall be directed to institute civil commitment proceedings. When it thereafter appears that the accused can effectively assist in his or her defense, that department shall give notice to the sheriff and county attorney of the proper county of such fact, and the sheriff, without delay, must receive and hold the accused in custody until he or she is brought to trial or judgment, as the case may be, or is legally discharged, the expense for conveying and returning the accused, or any other, to be paid in the first instance by the county from which the accused is sent, but such county may recover the same from another county or municipal body bound to provide for or maintain the accused elsewhere, and the sheriff shall be allowed for his or her services the same fees as are allowed for conveying convicts to the penitentiary.

■■ Under the prior statute, the burden of proving incompetency to stand trial, by a preponderance of the evidence, was on the defendant. § 783.2, The Code 1977. We think the rule is the same under the present statute notwithstanding absence of an express statutory provision. A defendant is initially presumed to be competent, and the burden to establish the contrary should be on him; if the evidence is in equipose the presumption should prevail. See on this subject, 21 Am.Jur.2d *Criminal Law* § 70 (1965); 23 C.J.S. *Criminal Law* § 940(5)(c), at 749–50 (1961); H. Weihofen, *Mental Disorder as a Criminal Defense* 434–35 (1954); Slough & Wilson, *Mental Capacity To Stand Trial*, 21 U.Pitt.L.Rev. 593, 603 (1960). *For this issue* counsel will be appointed to represent an unrepresented defendant whether the defendant desires counsel or not, as was properly done here.

II. In considering the totality of the circumstances in our de novo review, we turn to the two main parts of the record bearing on defendant's competency to stand trial: the views of the two psychiatrists, and defendant's utterances and conduct before, during, and after trial.

A. That the psychiatrists hold opposite views on defendant's competency is understandable in view of their diametrically opposing *approaches* to the problem and, to a certain extent, to psychiatry itself. Basically, Dr. Loeffelholz appears to believe that defendant could have counsel and cooperate with counsel if he *wills* to do so, while Dr. Young appears to believe that defendant has an illness which causes negativism and a delusion that *prevent* him from accepting and cooperating with counsel.

The two psychiatrists gave lengthy testimony at the pretrial hearing on defendant's competency. We can set out only a small

fraction of it. The following is illustrative of Dr. Loeffelholz's approach and conclusion:

Q. Now, Doctor, based upon your observation of him for a protracted period of time and under your direction of his care while he was at the Iowa Medical Facility at Oakdale, could you, in your own words describe Clarence Pedersen's psychological makeup for us? A. Well, Clarence is not the typical young man you would tend to run into; that you would classify as entirely, effectively adjusted in his life.

He is an individual who is a loner. He is an individual who tends to be untrusting of others. He is an individual who, as a child, did have some medical problems and the parents worked with him.

And, you know, I think in that rearing process you do your best job and sometimes personality doesn't mature as much. People don't begin to take as much charge of themselves as they ought to and other people have to help them get along. He gets asthma, hayfever and those types of things, but he gets into school and eventually he starts having some conflict with his peers; starts kicking up his heels and in those years substances were as prevalent then as now.

When he was in school he began to become involved with drugs; got kicked out. You can go so far when you tend to break the law and you mix that too with a person who really doesn't have much self-confidence; who is really kind of schizoid, who is not very effective at relating with people; daydreams, will prefer to sit by himself; and so you get a mixture of the antisocial and that kind of withdrawn picture.

You get increasing frustration, and it is not surprising that in time he ended up kicking at things or even mutilating some animals. That is done in anger, in frustration; filled up with emotion. It is not crazy. You don't have to find a crazy explanation for somebody who mutilates an animal.

Most persons involved in animal abuse, whatever you call it, cruelty to animals, are not crazy. They have some emotional kinds of problems handling feelings, mainly anger and frustration. We see a person, who, when things as he has gone through life, an individual with this kind of background has jammed it up on occasion; no doubt he jammed it up on occasion. The record will show it, but the shortcomings are also there, so what happens so often there is a bailing out. You get bailed out. If you say no to the problem frequently enough the problem goes away. This is not unique. The child will probably say, I didn't do it. I didn't do it, and the problem goes away. Or, no, no, no, I wasn't there. I wasn't there. Sometimes the problem goes away because people just kind of say, let it go because after all he is kind of quiet, he's kind of shy. He's this, he's that. We kind of caught his attention. So, we'll leave it alone or we will go to the Mental Health. We'll go to the magicians and they will take care of the problem. Call the psychiatrists.

Now, I think that is what was happening and obviously he's got to get into the system and take the medicine.

Now, you get somebody developing who then is sometimes seen as schizophrenic. I really don't have any big quarrel with that label, chronic undifferentiated schizophrenia. You know you can describe that person that way.

Now, I think if you look at a piece of symptom you can say, yes, that is craziness, but you have got to look at the whole picture. And when we do that that's what we attempt to do. We look at that whole picture and, sure, we can say that this individual tends to be overly suspicious. He is guarded. He doesn't cooperate when he chooses not to cooperate. He has a distrust of the legal profession or of attorneys.

That is not so unique. There are quite a few people in this culture who distrust attorneys, or physicians for that matter. That doesn't mean they have mental illness.

Now, I think when using a technique, if I say, no, no, no, the problem will go away. He is not going to change it overnight and he is not going to change it from my point of view. He is going to say, no, I didn't do it. But he also knows very clearly that his own behavior or his own reality contributes to the charge. He will tell you in detail, as has been said in this courtroom; what the charges are; who is dead and that he is charged and what could happen to him. So he knows that. But I don't know if he is involved with it or not. That's not my job to decide, so he knows it. He just says, I didn't do it.

Now, in view of his lifestyle it is not surprising that he says, I didn't do it. And he still says that.

Q. What lifestyle? A. Of dealing with problems, of having problems happen to him and never really acknowledging and saying I am at fault. And it's by taking responsibility that most of us grow and learn to deal with life more effectively.

When you run up against heat you either handle it or you don't. And he didn't handle it very well. And when he doesn't handle it he says, forget it. I am not involved. It wasn't me and I wasn't there or what have you or I didn't do it; do that type of thing.

It's kind of a pattern with dealing with stress. So, you know, it wouldn't be unusual to expect that much difference at this point, but, nevertheless, and so when you say you are not guilty and use the technique that always worked it's kind of frustrating to find out it doesn't work this time. And so you have got a person who is reluctantly cooperative. He is not going to admit. You know, I can't make him admit. It is not my job to do that.

So, you see, then the suspiciousness. He takes the position, for example, I am innocent. It has been said that he is, you know, is crazy for insisting he should be out of jail. I don't know that he is crazy if somebody says he is innocent and should be out of jail. I would be crazy if I said, I'm innocent. Keep me in jail.

It has been suggested that somehow that makes him mentally ill. Now, I recognize that there is a problem and he is denying the problem, but that's him. But he also accepts the reality of the problem, but he wants to put himself out of it and it's this kind of pattern of saying, Don't count me in, don't count me in, and eventually in life's pattern in the past he has been counted out and excused.

Dr. Loeffelholz testified at one point he has an opinion on whether defendant has a pronounced medical disorder. Then this occurred:

Q. What is it? A. In my opinion he does not have a mental disorder that is treatable with psychiatric medication. A personality shortcoming, and he may have some and it would not be unusual, as I said, to call him as having child chronic undifferentiated schizophrenia, but, you know, there is no reason to believe that medicine is going to do anything for that. He has had the medicine before, and running away from the places.

Also:

Q. And, Doctor, is he the victim of some mental disorder which prevents him from assisting effectively in his defense? A. No, he is not a victim of some treatable mental disorder that prevents him from assisting; at least cooperating with his defense.

Q. How about an untreatable mental disorder which is severe enough that keeps him from effectively assisting in his defense? A. He does not have that either.

On the other side, the following from Dr. Young's testimony is illustrative. After describing defendant as "an extremely dangerous, volatile, dangerous individual," Dr. Young testified:

Q. And now go back to the question before that which is, do you think he has some serious mental impairment? As I understand your testimony the impairment extends to his ability to assist coun-

sel. Is that a serious impairment in your mind? A. I feel he has a schizophrenic condition and he is not always psychotic. He phases in and out of psychosis, and so that in spite of a long term, chronic serious mental disorder this is not at all times so severe to say that he is always psychotic, no.

Q. In that light I think you indicated in your direct examination there are certain lapses. He lapses in and out of this mental condition. You talked about that; is that right? A. Lapses in and out of paranoid thinking.

Q. I see, and would that paranoid thinking necessarily occur during the times that he has this mental illness that you talked about? A. He has a mental illness all the time. Schizophrenia all the time. It may be operating to more or lesser degrees. I would expect later that, for example, when he was released from Mercy Hospital he had been on medications for a period of time. That it was operating to a much lesser degree than it was when he entered the hospital.

Q. Is that mental illness that you talked about, is that a serious mental impairment? Would that be a serious— do you see what I am driving at? Is he seriously impaired because of his mental condition? A. Is he currently psychotic?

Q. You say at times he is seriously mentally impaired and at times not. I ask you, is he seriously mentally impaired now, all the time since he had a mental condition? A. I feel like he has a delusion towards his lawyer, for example, and delusions about his being contained in jail. He may not have delusions about other things.

And in some aspects of his life he may be able to think rationally, at least from the standpoint of delusions, but he is still impaired at the present time from delusion associates and other aspects of mental illness.

Also:

Q. Was it correct when I said that you really didn't have an opinion as to whether his illness is a serious mental impair-

ment, or are you saying it is? A. No, I think it is. I think he is seriously mentally impaired. Certainly with respect to this question of his competency to stand trial. Overall he has a serious mental illness.

In addition Dr. Young testified:

He seemed frequently preoccupied with the fact that he should have been released within 30 days, and in explaining this to me he stated that he overheard two people talking in a courtroom setting and they said something about a trial by the 18th, I think. He could not tell me anymore about this. He wasn't sure whether they were lawyers or who they were or what authorities they were basing this on, but at any rate he felt that there was no doubt in his mind that this meant that he really should have been released by this time since more than 30 days had passed.

And in an attempt to explain to him why this might not have been the case was fruitless. And it appeared to me that this accounted for a good deal of his hostility in the examination.

In Dr. Young's report to the court, which he supported in lengthy testimony, we find the following:

Although he seemed fearful of the future at times, at other moments he expressed absolute confidence that he would be set free and that it was a mystery that he had not been freed as yet. "So I'll just have to wait until they let me go."

Also:

My impression is that Clarence Dean Pedersen is a disturbed and dangerous individual of low normal intelligence who also presents with marked antisocial tendencies. He exhibits paranoid thinking and outbursts of sadistic hostile impulses, as well as a tendency toward marked denial of unpleasant reality. Although organicity from past drug usage cannot be completely discounted and an electroencephalogram in 1976 showed Rt. Occipital spike activity, current psychological testing does not support a diagnostic impression of organicity. Diagnos-

tically Dean presents with Schizophrenia, Simple or Chronic Undifferentiated type.

Currently Dean appears to phase in and out of Psychotic delusional thinking and probably has done so as least since off of antipsychotic medication. It is possible that his delusional thinking has been of long standing and is more dominant in his current thinking than is now apparent.

Dean seems to have a fixed delusion that he is being held in jail unfairly; and partly from this stems his anger at, and current lack of cooperation with, his attorney, whom he believes should have obtained his release. He seems to have formed a secondary delusion that lawyers are bad by association, to further justify his anger at them. A change of attorneys would not help, nor does he want this, as he would be furious at the new attorney unless his immediate release was obtained.

It appears likely to me that Dean's current feeling of being bullied, tortured, and unreasonably restrained is of long standing, and that these readily present paranoid delusions result in a need for compensation, i. e. they provide a source of resentment and sadistic impulse which, although usually held in check or denied, breaks forth in outbursts of violent sadism, which has repeatedly led, for example, to the mutilation of animals.

Although Dean is at times grossly Psychotic, he is also an antisocial individual, with the notable exception that he can be a hard worker. Dean's hostile outbursts, sadism, lack of social effort, and repeated irresponsible dealings with other transients, although disapproved of by his parents, have met with little consequence except for well meaning but misguided overprotection. His criminal behavior also has met with relatively little consequence. Thus only to some degree can Dean's life pattern be explained by Psychosis or a downward social drift due to his illness. To some degree his irresponsibility and antisocial lifestyle may have led to or aggravated his paranoia which can provide another escape from conscience and facing one's actions. Thus

his parents report that for years he has had an attitude that "society" is no good. "He has no reasoning, he feels everything he wants is OK."

And this:

Dean was specifically interviewed about his knowledge of courtroom proceedings and his understanding and appreciation of the charge he faces, as well as the possible consequences of his alleged actions. He meets the test of competency in these areas. He refers to a previous jury trial in which he was a defendant. He volunteered that he is being held for the 1st degree murder of Kent Nelson and that he had discussed the possible consequences of the trial verdict with his attorney. He also stated that the judge would form a disposition, and if he is found guilty he would probably "get life to 25 years." He was also aware that he could be placed in a mental hospital.

In my opinion Dean is currently not capable of or willing to aid his lawyer in his defense, and for this reason I think he is incompetent to stand trial at this point. In my opinion the defendant's lack of cooperation is based upon his delusion that he should have been "released within 30 days", and thus the lack of cooperation is a product of mental illness. Dean appeared to cooperate with counsel initially, but even then he provided very little information. I too found it impossible to get a complete and reliable history from him.

Reports available to me from Mercy and Clarinda Hospitals show that Dean has been identified as being Schizophrenic. These reports show improvement of his behavior on antipsychotic medication. There is some reason to believe then that Dean may cooperate with counsel and be somewhat more informative with antipsychotic drug treatment. Since for years he has kept his thoughts to himself, I wouldn't expect medication to improve his communication markedly. It might help his delusions and therefore help him trust and cooperate with his attorney.

Dean admits that he is not working with his attorney, "I did at one time," he states. He recently refused my attempt to prescribe antipsychotic medication. A recent demonstration of Dean's inappropriate anger at and lack of cooperation with his attorney was his violent outburst in jail towards Harley Kraft, investigator for the Public Defender, whom he threatened to kill along with his lawyer and the Judge should he see them in court. Dean also refused to answer questions important to the case of the defense.

B. We have previously quoted the record regarding defendant's utterances and conduct before, during, and following trial. They are illustrative, and we see no necessity to quote the record further. The psychiatrists did not have the benefit of some of this subsequent information. What effect, if any, it might have on their views we do not know.

■ III. Where then does our de novo review of all these attendant facts and circumstances lead us? Defendant did not defend at all at the murder trial; the verdict was a foregone conclusion. The defender contends this was because defendant, from a delusion and negativism induced by mental illness, believed he had to be released under a thirty-day time limit. The prosecutor claims defendant could have had counsel and a defense if he had wanted them. Was defendant's refusal to accept counsel and a defense the result of mental illness, or was it cupidity or some other rational choice by him? This issue is essentially factual, but in arriving at our finding we have in mind the opening remarks of the United States Supreme Court in *Drope v. Missouri*, 420 U.S. 162, 171, 95 S.Ct. 896, 903–04, 43 L.Ed.2d 103, 112–13 (1975):

It has long been accepted that a person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to a trial. Thus, Blackstone wrote that one who became "mad" after the commission of an offense should not

be arraigned for it "because he is not able to plead to it with that advice and caution that he ought." Similarly, if he became "mad" after pleading, he should not be tried, "for how can he make his defence?" 4 W. Blackstone, Commentaries* 24. See *Youtsey v. United States*, 97 F. 937, 940–946 (CA6 1899). Some have viewed the common-law prohibition "as a by-product of the ban against trials *in absentia*; the mentally incompetent defendant, though physically present in the courtroom, is in reality afforded no opportunity to defend himself. Foote, A Comment on Pre-Trial Commitment of Criminal Defendants," 108 U.Pa.L.Rev. 832, 834 (1960).

Upon our de novo review of the entire record, pretrial, during trial, and posttrial, we find that from mental illness, defendant was unable to assist effectively in his defense. His conviction cannot stand, consistently with due process of law.

IV. The parties have argued several other issues, but we find no necessity to consider those questions in view of our disposition of the appeal on the central issue of defendant's competency at the time of trial.

V. We return the case to district court for further proceedings. The fact may be that defendant is now competent to assist effectively in his defense or that he may with treatment become competent; or that proceedings may be necessary under sections 812.4 and 812.5 of the Code; or that still other proceedings may be indicated. In any event the further proceedings are to comport, of course, with due process and sections 812.3 to 812.5 of the Code.

The clerk is directed to tax printing costs for defendant's brief at four dollars per page. Iowa R.App.P. 16(c).

REVERSED AND REMANDED.