**IN THE COURT OF APPEALS OF IOWA**

No. 16-1775
Filed May 16, 2018

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**NORMAN WADSWORTH,**
        Defendant-Appellant.
_____

Appeal from the Iowa District Court for Polk County, Richard G. Blane (competency) and Paul D. Scott (trial), Judges.

A defendant appeals his conviction for murder in the second degree.
**REVERSED AND REMANDED.**

Angela L. Campbell of Dickey & Campbell Law Firm PLC, Des Moines, for appellant.

Thomas J. Miller, Attorney General, Timothy M. Hau, Assistant Attorney General, and Kelli A. Huser, Assistant Attorney General, for appellee.

Heard by Doyle, P.J., and Tabor and McDonald, JJ. Blane, S.J., takes no part.

**TABOR, Judge.**

It is undisputed Norman Wadsworth killed Darlene Crook. What he disputes on appeal is whether he did so with malice aforethought and whether he was competent to stand trial. Wadsworth also contends his trial counsel was ineffective in not raising an insanity defense. Finally, he argues the district court erred in admitting autopsy photographs and evidence of a prior harassment conviction into the record.

On our de novo review, we find Wadsworth did not have the ability, at the time of trial, to assist his attorneys in his defense. Accordingly, we reverse and remand for further proceedings. We also find the evidence presented at trial was sufficient for the jury to reach a verdict of second-degree murder.

## I. Facts and Prior Proceedings

Norman Wadsworth suffered from schizophrenia for decades and received no treatment. He had a contentious relationship with the manager at his apartment complex, Darlene Crook, who he believed was part of a government conspiracy to kill him. Eventually, Wadsworth was evicted from his apartment. After being homeless for several months, Wadsworth tried to take a bus to a motel. He boarded the wrong bus and ended up just three blocks from his old apartment complex. He walked to Crook's office and attacked her with a knife. Crook died of blood loss from the seventy-one distinct wounds inflicted by Wadsworth.

A resident of the apartment complex heard the commotion and restrained Wadsworth until police could respond. Speaking with police officers, Wadsworth admitted he knew he was killing Crook, had contemplated doing so for some time, and entered the apartment complex for that reason. Wadsworth said competing

voices inside his head were telling him to either stab or not stab Crook. He believed Crook could hear the voices too. The State charged Wadsworth with first-degree murder.

Wadsworth's attorneys moved for a hearing to determine their client's competency to stand trial. At the hearing, the defense presented the testimony of psychologist Alan Goldstein, and the State countered with the testimony of psychiatrist Michael Taylor. The district court found Wadsworth competent, and the charges proceeded to a jury trial.[1] The jury found Wadsworth guilty of murder in the second degree. On appeal, Wadsworth argues he was not capable of assisting in his defense, insufficient evidence supported the verdict, trial counsel was ineffective for not raising an affirmative defense of insanity, and the autopsy photographs and evidence of his harassment conviction were unfairly prejudicial.

## II. Analysis

### A. Sufficiency of the Evidence for Murder in the Second Degree

Although we ultimately conclude Wadsworth was not competent, we must first address the sufficiency of the evidence for the conviction. We do this because if the evidence was insufficient, Wadsworth would be entitled to acquittal on the murder charge and double jeopardy would bar retrial. *See United States v. Gonzalez-Sanchez*, 825 F.2d 572, 588 n.56 (1st Cir. 1987) ("The double jeopardy clause does not prevent the retrial of a defendant after his conviction has been reversed on appeal unless the reversal was grounded on the insufficiency of the

---

[1] Before trial, defense counsel unsuccessfully sought interlocutory review of the competency ruling and filed a second request for a competency exam, which was denied by the district court.

evidence at trial. . . . Even if the appellate court finds alternative grounds for reversal, it must consider the defendant's challenge to this sufficiency of the evidence to ensure that the prohibition against double jeopardy is upheld.").

Wadsworth contends the record does not contain sufficient evidence of malice aforethought to support the verdict of murder in the second degree.[2] The jury was instructed malice aforethought is an element of murder in the first and second degree. *See* Iowa Code §§ 707.2, 707.3. First-degree murder requires an additional element that the defendant "acted willfully, deliberately, premeditatedly and with a specific intent to kill Darlene Crook." *See* Iowa Code § 707.2.

We review challenges to the sufficiency of the evidence for errors at law. *See State v. Hansen*, 750 N.W.2d 111, 112 (Iowa 2008). We will uphold the jury's verdict if it is supported by substantial evidence. *State v. Rooney*, 862 N.W.2d

---

[2] Wadsworth contends he preserved error on his sufficiency of the evidence claim by moving for judgment of acquittal. The State responds Wadsworth did not preserve error because he failed to challenge the element of malice aforethought in the district court.

A motion for judgment of acquittal will not preserve a sufficiency-of-the-evidence issue for review unless it identifies the specific elements of the crime for which the defense believes the evidence is lacking. *State v. Williams*, 695 N.W.2d 23, 27 (Iowa 2005) (citing *State v. Crone*, 545 N.W.2d 267, 270 (Iowa 1996)). Our supreme court has recognized an exception when "the record indicates that the grounds for a motion were obvious and understood by the trial court and counsel." *Id.*

At the close of the State's case, defense counsel moved for judgment of acquittal on the charges of murder in the first and second degree, asking the court to submit only a lesser-included manslaughter charge. Defense counsel stated Wadsworth was suffering from a mental illness such that "he was incapable of formulating malice aforethought." At the close of the defense case, counsel renewed the motion, stating, "This case should not be submitted to the jury as to murder in the first degree and murder in the second degree" because Wadsworth "did not have the requisite ability to form specific intent to commit the act causing the death of Ms. Crook." Defense counsel again asked the court to submit only manslaughter to the jury.

In the context of the jury instructions and the first defense motion, we find the second motion was a renewed attack on the malice aforethought element common to first- and second-degree murder. The court specifically found the evidence presented was sufficient to create a jury question on both first- and second-degree murder. Because it was understood from the context that Wadsworth's motion concerned the malice aforethought element, he preserved error.

367, 371 (Iowa 2015). We view the evidence in the light most favorable to the State, "including all reasonable inferences that may be fairly drawn from the evidence." *State v. Sanford*, 814 N.W.2d 611, 615 (Iowa 2012). We will deem the evidence sufficient if it could convince a rational jury the defendant was guilty beyond a reasonable doubt. *Rooney*, at 371. Evidence is not substantial if it raises only suspicion, speculation, or conjecture. *State v. Howse*, 875 N.W.2d 684, 688 (Iowa 2016).

To convict on second-degree murder, the instructions required the jury to find (1) Wadsworth stabbed Darlene Crook; (2) Crook died as a result of being stabbed; and (3) Wadsworth acted with malice aforethought. Wadsworth challenges only the third element. The court instructed the jury:

> "Malice" is a state of mind which leads one to intentionally do a wrongful act to the injury of another or in disregard for the rights of another out of actual hatred, or with an evil or unlawful purpose. It may be established by evidence of actual hatred, or by proof of a deliberate or fixed intent to do injury. It may be found from the acts and conduct of the defendant, and the means used in doing the wrongful and injurious act.

The court further instructed, "'Malice aforethought' is a fixed purpose or design to do some physical harm to another which exists before the act is committed. It does not have to exist for any particular length of time." The jury may properly consider the "fierceness and atrocity of the attack, the circumstances under which it was made, the nature and extent of the injury inflicted, the condition of the body and wearing apparel, the deadly nature of the weapon used, and the manner of using it." *State v. Nowlin*, 244 N.W.2d 591, 593 (Iowa 1976).

Taken in the light most favorable to the State, the record contained substantial evidence for a rational jury to conclude beyond a reasonable doubt

Wadsworth acted with malice aforethought. Wadsworth had a long-standing conflict with Crook. He believed she was responsible for his eviction and involved in a plot to kill him. The jury could reasonably infer he exhibited actual hatred against her or acted with an unlawful purpose of seeking revenge for his circumstances. When he found himself just three blocks from his old apartment complex, he chose to walk there, go to her office, and attack her with a knife he carried. The evidence may not support Wadsworth had a fixed purpose to kill Crook before the opportunity presented itself—because he took the wrong bus and told officers he carried a knife routinely for protection—but a reasonable jury could infer he developed a fixed purpose on the walk to the apartment complex. Crook died from seventy-one distinct wounds Wadsworth inflicted on her. He did not stop his attack until another resident intervened and restrained him. The attack was sufficiently fierce and atrocious to give a reasonable inference of malice.

Although a psychologist testified for the defense that Wadsworth could not have undergone a rational thought process to develop an intent to kill Crook, the jury was free to give that evidence less weight or disregard it. During a police interview, Wadsworth said he had contemplated killing Crook for some time and entered the building for that purpose. The evidence was sufficient to support a verdict of murder in the second degree.

### B. Competency

Although we conclude the evidence was sufficient to convict Wadsworth of second-degree murder, there is a predicate issue that supersedes that question. Wadsworth argues his mental illness left him incapable of aiding in his own defense. The State responds Wadsworth could assist trial counsel and evidence

to the contrary is explained by his stubborn refusal to cooperate with the defense competency expert.[3]  We find Wadsworth sufficiently demonstrated he was not competent to stand trial.

We review a competency determination de novo because it implicates constitutional rights.[4]  *State v. Lyman*, 776 N.W.2d 865, 872–73 (Iowa 2010), *overruled on other grounds by Alcala v. Marriot Int'l, Inc.*, 880 N.W.2d 699, 708, n.3 (Iowa 2016).  "[C]onviction of an incompetent defendant violates due process." *State v. Einfeldt*, ___ N.W.2d ___, ___, 2018 WL 1980676, at *4 (Iowa 2018) (citing *Pate v. Robinson*, 383 U.S. 375, 378 (1966)).  "We presume a defendant is competent to stand trial."  *Lyman*, 776 N.W.2d at 874.  Wadsworth bears the burden of proving his incompetency by a preponderance of the evidence.  *See id.* "If the evidence is in equipoise, the presumption of competency prevails."  *Id.* "Moreover, once a court finds a defendant competent to stand trial, the presumption of competency continues unless and until the defendant produces new evidence to the contrary."  *Id.*

The test for competency is whether "the defendant is suffering from a mental disorder which prevents the defendant from appreciating the charge,

---

[3] In his reply brief, Wadsworth takes issue with the State's argument that he was merely "stubborn" and refused to cooperate.  At oral argument, the State clarified it did not contest Wadsworth's diagnosis of schizophrenia.  We read the State's argument to mean Wadsworth's mental illness did not affect his ability to assist in his defense.

[4] We evaluate the totality of the circumstances.  *State v. Pedersen*, 309 N.W.2d 490, 495 (Iowa 1981).  Generally, this means we consider pretrial proceedings and trial evidence. *Id.*  But, in the present case we are limited in our review to the evidence presented at the competency hearing.  *See State v. Jackson*, 305 N.W.2d 420, 425 (Iowa 1981) (finding, in a case where there were two pre-trial competency motions and the court found there was no new evidence for a second hearing, review was limited to the record from the first hearing).  Although there was a second motion for a competency hearing shortly before trial, the trial court declined to hold one, finding no new evidence was offered.

understanding the proceedings, or assisting effectively in the defense." Iowa Code § 812.3(1). "The critical question is 'whether [the defendant] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him.'" *State v. Lucas*, 323 N.W.2d 228, 232–33 (Iowa 1982) (quoting *Dusky v. United States*, 362 U.S. 402, 402 (1960)).[5] The competency inquiry accomplishes the dual goals of reducing the likelihood of wrongful conviction and "ensur[ing] that an accused can remain actively and *meaningfully* involved in making decisions regarding his defense." *See* 3 Constitutional Rights of the Accused 3d § 21:1 (2017) (emphasis added).

Finding it difficult to get relevant information from Wadsworth, his trial counsel obtained an evaluation from a psychologist. Dr. Goldstein is a licensed and board-certified forensic psychologist who spent eight hours with Wadsworth over two days.[6] He interviewed Wadsworth about his family, employment, educational background, and his prior criminal record, in the presence of counsel.

---

[5] The *Dusky* standard, despite being nearly sixty years old,

> has escaped significant elaboration by courts and theorists. It is also highly unpredictable in application, in large part because the task of implementing Dusky generally falls to forensic experts, to whom courts defer heavily but to whom firm guidance as to the legal standard is seldom given. These experts—typically psychologists and psychiatrists, but sometimes specialists in other areas of medicine and the mind sciences—may differ wildly in approach, theoretical framework, understanding of the relevant legal constructs, and conclusions. Factually similar cases therefore may meet different outcomes; indeed, it is common for different experts to reach diametrically opposed conclusions in the same case.

Terry A. Maroney, *Emotional Competence, "Rational Understanding," and the Criminal Defendant*, Am. Crim. L. Rev. 1375, 1379–80 (2006).

[6] Goldstein testified the two-day schedule enabled him to see variability in Wadsworth's behavior over time.

Goldstein administered numerous psychological tests.[7]   He also examined legal records, police investigation reports, medical records, and the video recording of Wadsworth's police interrogation.  Goldstein concluded Wadsworth was delusional and in need of medication.  Goldstein submitted a twelve-page written report and testified at the competency hearing regarding his conclusion that Wadsworth was not competent to assist in his defense.

The defense expert reported Wadsworth became defensive, irritated, and frustrated when asked questions, even with counsel present, and at one point terminated their interview by walking out.  When answering questions, Wadsworth became disoriented and had difficulty answering in a logical and chronological manner.  Although sometimes he was coherent and emotionally appropriate, he was also paranoid and delusional at times.  Goldstein found Wadsworth's statements "didn't make much sense" and were contradictory.  But Wadsworth denied mental-health symptoms and had no insight into his behavior.  He also objected strenuously when Goldstein suggested he begin taking medication for his mental-health symptoms.

Goldstein also interviewed Wadsworth's brother, Herman, who confirmed Wadsworth's long history of mental illness, noting Wadsworth had received Social Security disability benefits for thirty years based on his mental disorder.  Goldstein opined Wadsworth had "virtually no frustration tolerance" when questioned about his delusions, but viewed the trial "as his attempt to get up on a soap box and

---

[7] Goldstein administered the Wechsler Adult Intelligence Scale—IV; Stroop Neuropsychological Screening Test; Symbol Digit Modalities Test; and Structured Interview of Reported Symptoms—Second Edition.

explain how the victim in this case did everything to evict him, had attempted to kill him, and he'd been set up by the police."

In his written report, Goldstein noted Wadsworth's tendency to ramble when discussing the murder charge and a prior harassment charge, "merg[ing] his last two arrests," and that he tended to "'become lost' in his belief that he had been set up by the victim and others who plan to 'kill him.'" Goldstein found Wadsworth was "unable to provide a rational, logical link between his delusions and hallucinations and the instant offense" and "did not allow himself to be pressed for information, clarification, or for additional details that might be helpful to his attorney."

Goldstein also related Wadsworth's theories that police set him up thirty years ago when he spent time in Fort Madison, that a "secret" machine implanted the voices in his head at that time, and that his case involved a government conspiracy. Wadsworth admitted to Goldstein he had been hearing voices for more than three decades, but Wadsworth did not view them as symptoms of mental illness. Instead, Wadsworth believed he was mentally normal and became agitated when pressed further. Wadsworth also told Goldstein being thrown out of his apartment was part of a plan—that the voices had "set him up," and Crook was able to hear the voices. Goldstein testified Wadsworth was incapable of explaining the voices he heard or how they fit into his life.

Goldstein expressed concern about Wadsworth's ability to "sit through a trial, to listen to what's going on, to understand in a rationale manner what witnesses are saying." Goldstein further doubted whether Wadsworth could "sit quietly at trial without being disruptive and without arguing with [trial counsel] or shouting at witnesses." When asked whether Wadsworth could be "faking" a

mental illness, Goldstein observed Wadsworth "is totally invested in presenting himself as someone who has no mental illness whatsoever." He cited the Structured Interview of Reported Symptoms assessment, which measures the subject's attempts to exaggerate or malinger regarding mental illness. Goldstein observed Wadsworth's score to be "exceedingly low." Goldstein admitted Wadsworth understood the legal process and what would happen at trial, including the role of the judge and jury, plea bargaining, and the evidence against him— Goldstein stated Wadsworth "gets an A" on that measure. Goldstein further explained Wadsworth was able to communicate effectively about the substance of his delusions. But he was a "total failure" in "his ability to assist [counsel], communicate in a reasonably rational manner."

Goldstein suggested Wadsworth was "intellectually impaired" and his IQ fell within a borderline range; Goldstein noted Wadsworth had taken remedial classes throughout his school career and exhibited "overly simplistic" thinking. Goldstein concluded, Wadsworth's "mental confusion, his distractibility, his denial of obvious emotional difficulties, and his inability to tolerate discomfort when being questioned, significantly interfered with his ability to confide in his attorney and to provide information to me and to her that may help in the handling of this case."

The State's expert witness took a more hands-off approach and reached very different conclusions. At the time of the competency hearing, Dr. Michael Taylor was a licensed psychiatrist.[8] He reviewed the trial information, police reports, the video recording of Wadsworth's police interrogation, and

---

[8] Before trial, Taylor lost his license to practice medicine for failure to keep required medical records.

Dr. Goldstein's report, as well as the results of Goldstein's psychological tests. Taylor interviewed Wadsworth at the Polk County Jail for about ninety minutes and produced a two-page report, as well as testifying at the competency hearing.

At the outset of the interview, Taylor explained to Wadsworth he did not need to answer questions he did not wish to answer and could end the interview at any time. Taylor described Wadsworth as calm, polite, and cooperative. Taylor did not see any agitation or irritability. Wadsworth told Taylor about the competing voices in his head trying to persuade him to do things but added, "I just brush them off." As Wadsworth approached Crook's office, the voices were arguing about whether Wadsworth should stab her. But Wadsworth vehemently denied to Taylor that the voices had any influence in his stabbing Crook. Taylor reported Wadsworth displayed no other types of "pathological thought content." His mental status examination was "within normal limits," and he displayed no abnormalities or impairments as described in Goldstein's report.[9] According to Taylor, Wadsworth described the harassment incident and the stabbing in a concise manner, "clearly separated chronologically" without any confusion between the two. Taylor concluded:

> Mr. Wadsworth is fully knowledgeable about the charges pending against him and the roles of the various parties involved in any pending legal proceedings. He stated that he fully understands the information and explanations provided to him by [trial counsel], and expressed his relief "that I have a lawyer that I trust." Additionally, he is fully capable of cooperating with his counsel in a rational and meaningful manner in presenting a defense. Mr. Wadsworth is clearly competent to stand trial.

---

[9] In a less than professional passage in his report, Dr. Taylor stated: "There is no way in hell that this man has *any degree* of Mental Retardation."

At the competency hearing, Taylor reiterated he saw nothing indicating impairment to Wadsworth's abilities to communicate, concentrate, or maintain attention. He opined Wadsworth understood the charges and the roles of the parties. Taylor professed he had no difficulty getting Wadsworth to discuss his mental-health symptoms. In contrast to Goldstein, Taylor stated it was unnecessary to interview a subject at different times because psychiatric conditions do not vary significantly from day to day. Taylor opined Wadsworth was "stubborn" and angry at Goldstein and, therefore, did not put significant effort into Goldstein's evaluation. But, Taylor also offered no alternative explanation for Wadsworth's delusions or auditory hallucinations and did not suggest Wadsworth was malingering or faking any symptoms for his own benefit.

The district court found Wadsworth competent to stand trial. The court included no rationale in its ruling as to how it weighed the conflicting expert opinions but noted Wadsworth's conduct during the hearing required no intervention from the court or his attorneys.[10] In our de novo review, we place less significance on Wadsworth's outward demeanor and more on his inability to meaningfully assist his attorneys in effectively defending the murder charge because of his untreated schizophrenia.

---

[10] Missing from our record are professional statements from Wadsworth's attorneys as to the concerns they had about his ability to assist them. The Supreme Court has recognized "defense counsel will often have the best-informed view of the defendant's ability to participate in his defense." *Medina v. California*, 505 U.S. 437, 450 (1992). But often counsel is constrained by concerns of protecting the attorney-client privilege or threatening a strained attorney-client relationship, "especially if the attorney believes the defendant is incompetent and the defendant believes to the contrary." *See* Grant H. Morris et. al., *Competency to Stand Trial on Trial*, 4 Hous. J. Health L. & Pol'y 193, 199 (2004). Even though the current record does not contain statements from Wadsworth's trial counsel about the difficulties they were having, those concerns were conveyed to Dr. Goldstein and his examination took them into consideration.

The State encourages us to apply the rationale of *State v. Johnson*, 784 N.W.2d 192 (Iowa 2010) (finding defendant failed to prove he was incompetent to stand trial where competing experts drew opposite conclusions). After thoroughly reviewing Johnson's medical history and administering psychological tests, as well as conducting an extensive interview, the defense expert found Johnson was unable to effectively assist his attorneys. *Johnson*, 784 N.W.2d at 194–95. The State's expert spent less time assessing Johnson but reviewed documents, including the defense expert's report, and interviewed Johnson for several hours. *Id.* The State's expert concluded Johnson's responses were "self-serving" and calculated to "help his case." *Id.* The trial court also observed Johnson's behavior and noted his appropriate courtroom demeanor and that he consulted several times with his attorneys during the proceedings. *Id.* Persuaded by the testimony of the State's expert, our supreme court affirmed, concluding Johnson failed to meet his burden. *Id.* at 194-96.

We find *Johnson* distinguishable for two reasons. First, the State's expert suggested Johnson *exaggerated* the impact of his borderline personality disorder on his ability to consult with counsel to gain an advantage in the legal proceedings. *Id.* Here, Wadsworth *minimized* the symptoms of his mental disturbance and was "massively invested" in denying he had a mental illness. Even Dr. Taylor acknowledged Wadsworth denied his need for psychiatric treatment, despite his long-time schizophrenia diagnosis and current delusions. We agree with Dr. Goldstein that Wadsworth's lack of insight into his mental illness would interfere with his ability to assist in his defense. Second, in *Johnson* our supreme court found an equivalency between the time and attention devoted to their evaluations

by the experts for the State and for the defense. *Id.* Here, we give greater weight to Dr. Goldstein's conclusions because his evaluation was far more thorough and comprehensive than the interview performed by Dr. Taylor. *See United States v. Casteel*, 717 F.3d 635, 642–43 (8th Cir. 2013) (noting trial court appropriately gave more credit to the expert who spent significantly more time evaluating the defendant).

Competency decisions often hinge on a "battle of the experts." Where, as in *Johnson*, the experts conduct substantially equivalent reviews of the case, it is "within a district court's province to choose one expert's opinion over a competing qualified expert's opinion." *See United States v. Ghane*, 593 F.3d 775, 781 (8th Cir. 2010). But, the reviewing court must "look closely at the rationale underlying" the district court's conclusion as to which expert to credit. *See id.* "[E]xpert opinion on competency rises no higher than the reasons on which it is based." *United States v. Whittington*, 586 F.3d 613, 618 (8th Cir. 2009) (quoting *Feguer v. United States*, 302 F.2d 214, 236 (8th Cir. 1962)).

Here, both experts made strikingly similar observations as to Wadsworth's diagnosis and symptoms but came to opposite conclusions as to whether Wadsworth was able to assist counsel in his defense. Both agreed Wadsworth had a long history of untreated schizophrenia. Both found Wadsworth exhibited delusional thinking about the crime and the circumstances surrounding it. Both observed that Wadsworth believed in a decades-long conspiracy orchestrated by the government and Crook to evict and kill him. Both agreed he heard voices that encouraged him to stab Crook. Both agreed Wadsworth had a functional

knowledge of the trial process, the role of various actors at trial, and the charges and evidence against him.

But then the experts parted ways. Taylor concluded Wadsworth's ability to follow trial procedures showed he was competent to assist his attorneys. In contradiction, Goldstein opined, although Wadsworth was able to follow the technical aspects of the trial, his inability to communicate in a rational manner about the factual circumstances of the killing or about his own mental illness and how it affected his conduct rendered him unable to "meaningfully participate in his trial, to make informed decisions about his case, and to reveal information to his attorneys." Taylor's conclusion addresses only the "factual understanding" prong of the *Dusky* test, while Goldstein's opinion tackles the separate notion of a "rational understanding" of the proceedings. *See Pedersen,* 309 N.W.2d at 501 (reversing conviction because although the defendant appeared to have a factual understanding of the proceedings against him, delusions fueled by schizophrenia prevented him from cooperating with defense counsel, rendering him "unable to assist effectively in his defense"); *see also United States v. Ghane*, 490 F.3d 1036, 1040 (8th Cir. 2007) (affirming trial court order finding defendant incompetent to stand trial because although he "had a factual understanding of the charges against him, his understanding was not rational because he believed the charges were part of a wide ranging government conspiracy"); *Lafferty v. Cook*, 949 F.2d 1546, 1552–55 (10th Cir. 1991) (holding competency finding could not be based only on petitioner's factual understanding of proceedings against him, but also had to be based on finding that he had rational understanding and Lafferty's persistent delusions did not allow him to cooperate rationally with his attorney). Furthermore,

our supreme court has recently reemphasized that "the 'rational understanding' required under *Dusky* means more than being 'oriented to time and place' but includes accurate perception of reality and proper response to the world around the defendant." *Einfeldt*, ___ N.W.2d at ___ (quoting *Lafferty*, 949 F.2d at 1550).

We find deficient support for Dr. Taylor's conclusion Wadsworth was capable of effectively assisting in his own defense. Taylor insisted Wadsworth denied the voices swayed him to stab Crook or that he experienced any other "pathological thought content." But that opinion sprang from Wadsworth's own reports, not an objective inquiry by Taylor. Taylor told Wadsworth before their interview he was free to decline to answer any question, and Taylor did not press Wadsworth on his delusional thinking. Taylor accepted Wadsworth's explanation he was able to ignore the voices without further interrogation, while Goldstein's further inquiry into these issues pushed Wadsworth to become defensive, irritable, and taciturn. We are concerned about the defects in his perception and understanding that may have impeded Wadsworth's ability to consult with counsel and make rational decisions, even though he appeared to have a factual understanding of the technical trial proceedings.

Overall, Goldstein's testing and interview were far more rigorous and exposed significant problems Wadsworth had communicating about issues critical to his defense, including his delusions and his thought processes surrounding the crime. Wadsworth exhibited these difficulties even though the exam was conducted in the presence of his attorneys. Goldstein pressed Wadsworth on his mental-health issues and delusional thought content to the point Wadsworth grew frustrated and, at one point, ended their interview. But such pointed conversations

between Wadsworth and his counsel would have been essential to formulate and put on a vigorous defense. We assign Goldstein's report and testimony greater weight than Taylor's view.

In our de novo review, we accept Goldstein's conclusion Wadsworth did not portray a rational understanding of the proceedings against him. Neither did Wadsworth have a rational view of his own mental state during or after the crime. He denies any symptoms of mental illness, while admitting to hearing voices for thirty years. He believed he could ignore the voices. Yet, voices told him to stab Crook and he did so. He saw the trial as an opportunity to expose the existence of a government conspiracy to kill him, in which he believed Crook participated. It is unlikely trial counsel could have a meaningful discussion about the facts of the case with Wadsworth given his entrenched delusions or that Wadsworth could participate "actively and meaningfully" in making decisions about his defense. Discussions of Wadsworth's mental state and the circumstances leading up to the killing were particularly critical given the mental elements of the murder charge.

Because of difficulties communicating with Wadsworth, his trial attorneys sought a competency evaluation—advising Dr. Goldstein that Wadsworth avoided discussing details of the offense, which would assist them in representing him. We find it significant Wadsworth could not rationally discuss with his attorneys the role his delusions and psychotic symptoms may have played in his actions. When they pressed Wadsworth for details, he shut down the conversation.

We acknowledge some of Dr. Goldstein's fears about Wadsworth's ability to sit through a trial without being disruptive did not come to fruition. In its ruling, the district court emphasized Wadsworth did not engage in any conduct at the

competency hearing requiring intervention by the court or counsel. We appreciate the district court's ability to observe the defendant, but an inability to sit quietly in court is not the only danger contemplated when we discuss a defendant's capacity to assist counsel in the defense. *Drope v. Missouri*, 420 U.S. 162, 179 (1975). We are more concerned with the defendant's comprehension of the proceedings, his ability to assess his options and inform his counsel's strategies regarding the factual circumstances of the case.[11] At oral argument, Wadsworth's appellate counsel asserted proving insanity was the only way to defend against the murder charge. *See* Iowa Code § 701.4. Insanity is an affirmative defense that the defendant must prove by a preponderance of the evidence. *See* Iowa R. Crim. P. 2.11(11). Because Wadsworth's untreated mental illness hindered his ability to assist counsel in raising the most potent available defense, we conclude he lacked a rational understanding of the proceedings and was not competent to stand trial.

An uncooperative defendant makes mounting a vigorous defense difficult, but where that difficulty stems from delusions caused by mental illness, a competency issue arises and due process is violated if the defendant is forced to

---

[11] Wadsworth's attorneys requested a second competency hearing and brought forward as additional evidence letters Wadsworth had handwritten and sent to the judge. In a September 5, 2015 letter, Wadsworth told the judge, even though he had waived speedy trial, his understanding was, "[B]y law I am to be Released after a year." Later, in April 2016, Wadsworth told the judge he had been set up on the homicide charge and "for the pas[t] 35 years by Polk County." Although Wadsworth does not now assert an error in failing to hold a second competency hearing, it is consistent with our reading of the evidence that Wadsworth continued to display delusions and irrational misconceptions throughout the pre-trial period. But the duty to attend to competency issues throughout the proceedings persists: in *Einfeldt*, our supreme court emphasized, "'[E]ven when a defendant is competent at the commencement of his trial, the trial court must always be alert to circumstances suggesting a change that would render the accused unable to meet the standards of competence to stand trial.'" ___ N.W.2d at ___ (quoting *Drope*, 420 U.S. at 181).

proceed without the capacity to aid his attorney. Given his strongly held delusions and his related aversion to discussing his mental health status candidly, we cannot find Wadsworth had sufficient present ability to consult with counsel with a reasonable degree of rational understanding. The evidence tipped in favor of finding Wadsworth incompetent to stand trial.

We need not address Wadsworth's other arguments. But because substantial evidence supported his second-degree murder conviction, Wadsworth is not entitled to acquittal on that offense. *See Pedersen*, 309 N.W.2d at 501 (remanding case to district court for further proceedings including trial when defendant regains competency); 3 Constitutional Rights of the Accused 3d § 29:1, 29. We reverse the conviction and sentence and remand for further proceedings consistent with this opinion.

**REVERSED AND REMANDED.**