# IN THE SUPREME COURT OF IOWA

No. 18–1292

Filed December 6, 2019

**STATE OF IOWA,**

Appellee,

vs.

**DARREON CORTA DRAINE,**

Appellant.

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Scott County, Mark D. Cleve (motion for competency evaluation and plea) and Henry W. Latham II (motion in arrest of judgment), Judges.

A defendant appeals his conviction for willful injury resulting in serious injury, in violation of Iowa Code section 708.4(1). **DECISION OF COURT OF APPEALS AND JUDGMENT OF DISTRICT COURT AFFIRMED.**

Mark C. Smith, State Appellate Defender, (until withdrawal), and Melinda J. Nye, Assistant Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, Tyler J. Buller, Assistant Attorney General, Michael J. Walton, County Attorney, and Andrea L. Glasgow and Caleb J. Copley, Assistant County Attorneys, for appellee.

**WIGGINS, Chief Justice.**

The State charged Darreon Draine with willful injury resulting in serious injury, in violation of Iowa Code section 708.4(1) (2018). He was sixteen years old at the time he allegedly committed the crime. His counsel filed a reverse-waiver motion requesting the district court transfer the case to the juvenile court. The district court denied the reverse-waiver motion. Counsel then moved the court to suspend the proceedings and order a competency evaluation for Draine. The court also denied this motion. Draine decided to plead guilty. After entry of his plea, Draine filed a timely motion in arrest of judgment. The court denied the motion in arrest of judgment and sentenced Draine. Draine filed his notice of appeal on July 18, 2018.

Draine raises three issues on appeal. First, he claims the district court erred in denying his request for a competency evaluation shortly after it denied his reverse-waiver motion. Second, he argues the court erred in overruling his motion in arrest of judgment. Finally, he argues the court should have ordered a competency evaluation following his motion in arrest of judgment.

We transferred the appeal to the court of appeals. It affirmed Draine's conviction on May 15, 2019. The court of appeals found the district court did not err in not ordering an initial competency hearing. It also found "Draine [did] not identify any specific facts upon which the court should have relied to hold a preliminary hearing and find probable cause to order a competency evaluation following the motion in arrest of judgment." Finally, it found the district court did not abuse its discretion when it denied Draine's motion in arrest of judgment. Draine asked for further review on May 31, 2019, which we granted on June 18, 2019.

In the 2019 legislative session, the general assembly amended Iowa Code section 814.6(1) (2019). The amendment denies a defendant the

right of appeal from a guilty plea, except for a guilty plea to a class "A" felony or in a case where a defendant establishes good cause. 2019 Iowa Acts ch. 140, § 28 (to be codified at Iowa Code § 814.6(1)(*a*)(3) (2020)). The amendment's effective date was July 1, 2019. *See* Iowa Code § 3.7(1) (2019). The State in its supplemental brief argues we should apply the amendment retroactively. Thus, the State contends, we have no jurisdiction of the appeal regarding Draine's guilty plea or the district court's denial of Draine's motion in arrest of judgment under this amendment.

We addressed this jurisdictional issue in *State v. Macke*, 933 N.W.2d. 226, 235 (Iowa 2019). There we held the amendment to section 814.6(1) is not retroactive and the statutes controlling appeals are those that were in effect at the time the judgment or order appealed from was rendered. *Id.* Therefore, we do have jurisdiction of this appeal.

As to the merits of the appeal, when reviewing an application for further review, we retain discretion to review all the issues raised on appeal or in the application for further review, or only a portion thereof. *Gits Mfg. Co. v. Frank*, 855 N.W.2d 195, 197 (Iowa 2014). In our discretion, we choose to review only the jurisdictional issue raised by the State on further review. Accordingly, the court of appeals decision stands as the final decision as to Draine's claims the district court erred in failing to order a competency evaluation prior to Draine's guilty plea and at or near the time Draine filed his motion in arrest of judgment. The court of appeals decision also stands as the final decision regarding Draine's claim the district court abused its discretion when it denied his motion in arrest of judgment. Consequently, we affirm the district court's judgment in this matter.

**DECISION OF COURT OF APPEALS AND JUDGMENT OF DISTRICT COURT AFFIRMED.**

Waterman, Mansfield, and Christensen, JJ., join this opinion. Mansfield, J., files a concurring opinion in which Waterman and Christensen, JJ., join. Appel, J., files a dissenting opinion. McDonald, J., takes no part.

**MANSFIELD, Justice (concurring specially).**

I join the majority opinion.  I write separately to explain briefly why I agree with the determinations of the district court and the court of appeals that did not find probable cause to believe Darreon Draine was "suffering from a mental disorder which prevent[ed] the defendant from appreciating the charge, understanding the proceedings, or assisting effectively in the defense."  Iowa Code § 812.3(1) (2018).  To be sure, the dissent raises some legitimate overall concerns about juveniles and their competency to stand trial.  However, I am not convinced they are manifested in this particular case.

A critical point is that Draine had been seen repeatedly over the years by mental health professionals, partly at the insistence of his mother.  They had diagnosed his issues as *behavioral.*  This is not a situation of a young man falling through the cracks and not receiving diagnosis or treatment.  In December 2017, a detailed evaluation by a psychiatrist concluded that Draine exhibited "ADHD Combined type," "Conduct Disorder Childhood-Onset," "Nonadherence to Medical Treatment," "Oppositional Defiant Disorder," and "Intellectual Disability Mild."  In fact, an earlier note had stated, "The doctors think he is functioning higher than what his IQ shows."  On January 9, 2018, the same psychiatrist followed up with the Iowa Department of Human Services and gave the following verbal recommendation:

> [B]ecause this is primarily behaviors he really should go into the juvenile system and be held accountable for these behaviors as medicines are not a fix . . .  [H]e has been given every opportunity at every level to work on these behaviors and has chosen not to do so.

Two weeks later, Draine beat up a thirty-year-old staff member at his latest placement, giving him a concussion along with other cranial and facial injuries and leading to the criminal charge in this case.

Thus, when Draine's attorney filed his April 2018 motion for competency evaluation in the present case, a psychiatric evaluation of Draine had just occurred four months earlier. This psychiatrist, like other mental health professionals before him, had concluded that Draine's issues were mainly behavioral. The district court reviewed these records and discussed them when it denied Draine's motion for competency evaluation.

Furthermore, while attorney representations to the court should always be taken seriously, the district court here did exactly that. Draine's attorney made three points at the hearing. First, he noted that in their most recent meeting, Draine had "misidentified [him] as his juvenile court attorney as opposed to his District Court attorney initially." This strikes me as unexceptional for a person who is enmeshed in the legal system and has different appointed counsel serving different roles. Second, the attorney said that after he "got through what [he] wanted to get through fairly quickly, probably in about 20 minutes or so," and as he was getting ready to leave, Draine threatened him "first for talking with him and then for looking at him." Third, the attorney relayed secondhand reports of Draine urinating all over his jail cell and "engag[ing] in continuous threatening behavior at the jail." The district court specifically discussed the second and third representations in its ruling on Draine's motion, finding them characteristic of the previously diagnosed behavioral issues.

We also have transcripts of the guilty plea and sentencing proceedings. These support the conclusions of the district court and the court of appeals that Draine understood the proceedings against him and

his issues were behavioral. Notably, at the guilty plea hearing, Draine and his counsel made a clarification about Draine not having struck the victim with a radio:

> MR. TUPPER: Your Honor, just for clarity of the record, Mr. Draine and I had discussed this matter multiple times previously. He does indicate that the portion of the Minutes of Testimony in the police reports where it is said he struck Mr. White with a radio -- he indicates that didn't happen, but he does admit the other portions of the assault where he was striking Mr. White with his fist. So there is a portion of the Minutes that he does disagree with, and I just wanted to clarify that.
>
> THE COURT: Very well.
>
> MR. TUPPER: Do you agree with that?
>
> THE DEFENDANT: Yeah.

Then, at sentencing, Draine made the same clarification *without* the assistance of counsel:

> I shouldn't go like to prison or nothing, because I didn't hit the dude with a radio, I hit him with my closed fist. So I shouldn't go to prison or Eldora or anything like that. I should be on probation here with my mom, you know, my family. So that's all I got.

Accordingly, not only did Draine understand the charges against him, he understood them well enough to insist on making a factual clarification and argue why it should mitigate his punishment.

*State v. Einfeldt* is a different case. *See* 914 N.W.2d 773 (Iowa 2018). There, the defendant had a prior diagnosis of mental illness and was engaging in bizarre courtroom behavior. *See id.* at 781–83. *State v. Kempf* is also a different case. *See* 282 N.W.2d 704 (Iowa 1979). There, the sixteen-year-old defendant had a "limited grasp of reality," was allowed to plead guilty against his attorney's recommendation, and was sent for a

psychiatric evaluation following the guilty plea that the district court disregarded. *See id.* at 707–10.

For the foregoing reasons, I specially concur.

Waterman and Christensen, JJ., join this special concurrence.

**APPEL**, **Justice (dissenting).**

Thirty years ago, the commentary to the ABA Criminal Justice Mental Health Standards declared that "present mental incompetency . . . is the single most important issue in the criminal mental health field." ABA Criminal Justice Mental Health Standards, standard 7-4.1 cmt. intro., at 168 (Am. Bar Ass'n 1989). In my view, this comment is as true today as when it was first made. The issue of adjudicative competence in this case demands thorough and careful consideration.

After examining the record, I conclude the district court did not properly consider the cumulative impact of factors in the record related to the competence of the defendant: intellectual disability reflected in an IQ of 60, a history of Attention Deficit Hyperactivity Disorder (ADHD) and Oppositional Defiant Disorder (ODD), the age of the defendant and the impact of age on psychological development, and the professional statement of counsel regarding his ability to communicate with the defendant. When these factors are cumulatively considered, I conclude there is enough here to inquire further by requiring a competency examination by a qualified professional.

As a result, I respectfully dissent.

**I.  Introduction.**

Darreon Draine is an African-American youth who was charged at age sixteen with willful injury causing serious injury in connection with an alleged assault on a staff member at the Annie Wittenmeyer residential program in Davenport, Iowa. After the charge was filed, Draine filed a motion for reverse waiver into juvenile court. In support of his motion, Draine produced various medical records. Among other things, the records showed an IQ of 60, diagnosis of ADHD and ODD, and a long

history of irrational behaviors. Statements appear in the records that Draine "does not appear to understand how his behavior negatively impacts others;" that at age thirteen, his general intellectual abilities were estimated to be "in the extremely low range;" and that his verbal comprehension skills were also "in the extremely low range." His perceptional reasoning skills were said to be in the borderline range, scoring in the (lowest) second percentile.

A juvenile court officer filed a reverse-waiver investigation report, which advocated that the reverse waiver be granted. According to the reverse-waiver investigative report, Draine's mental health limitations "can be better handled in Juvenile Court Services in conjunction with [the] Department of Human Services." The district court, however, denied the motion for reverse waiver.

Draine's counsel then filed a motion with the district court to suspend proceedings and order Draine to undergo a competency evaluation. After a hearing, the district court denied the motion.

Two weeks after the district court denied the motion for a competency evaluation, Draine signed a plea agreement, pleading guilty to the pending charge. The court held a hearing, accepted the plea, and ordered preparation of a presentence report.

Draine next filed a motion in arrest of judgment, and his attorney sought to withdraw. The district court granted the motion to withdraw and set a hearing for the motion in arrest of judgment and sentencing. At the hearing, Draine asserted he did not realize he was entering a guilty plea during the plea proceeding. The district court denied Draine's motion in arrest of judgment and continued sentencing. Because of his age, the provisions of Iowa Code section 901.5(14) (2018) applied, thereby making Draine eligible for a deferred judgment or sentence. The district court,

however, determined that a prison term was most appropriate and sentenced Draine to an indeterminate ten-year term of imprisonment.

## II. Overview of the Role of Competence in Criminal Justice.

**A. Introduction.** The common law long recognized that an incompetent defendant could not be subject to criminal punishment. Modern caselaw continues to embrace the notion that an incompetent defendant cannot be brought to trial in a criminal proceeding. *Drope v. Missouri*, 420 U.S. 162, 171, 95 S. Ct. 896, 903 (1975); *Dusky v. United States*, 362 U.S. 402, 402–03, 80 S. Ct. 788, 788–89 (1960) (per curiam).

Why has the law generally required that a criminal defendant be competent in order for the state to impose criminal sanctions? Two reasons have been advanced. An incompetent defendant cannot provide meaningful or adequate assistance to counsel, and as a result, in our adversarial system the reliability of verdicts is undermined. *See United States v. Merriweather*, 921 F. Supp. 2d 1265, 1303 (N.D. Ala. 2013) ("[T]he *Dusky* standard requires that a defendant have some ability to confer intelligently, to testify coherently, to follow and evaluate the evidence presented, and have some awareness of the significance of the proceeding and some ability to understand the charges against him, the defenses available to him, and the basic elements of a criminal trial."). In addition, personal autonomy is undermined by the criminal trial of an incompetent defendant. While lawyers are generally vested with the authority to make certain tactical decisions, fundamental decisions, such as the decision whether to plead guilty, lie with the criminal defendant. *See Godinez v. Moran*, 509 U.S. 389, 396, 113 S. Ct. 2680, 2685 (1993) ("A criminal defendant may not be tried unless he is competent, and he may not waive his right to counsel or plead guilty unless he does so 'competently and intelligently.'" (citation omitted) (quoting *Johnson v. Zerbst*, 304 U.S. 458,

468, 58 S. Ct. 1019, 1025 (1938))). An incompetent criminal defendant is not able to exercise his right to engage in plea bargaining. Although the rationale for incompetence doctrine is not complicated, the doctrine, as will be seen below, has proven uncertain in its application.

**B. Approach of the United States Supreme Court.**

The United States Supreme Court has generally addressed the question of the competence of criminal defendants in three cases. These Supreme Court cases generally describe a competence standard but are largely ambiguous as to its application.

The most frequently cited case dealing with competency to stand trial is the one-page per curiam opinion in *Dusky*, 362 U.S. 402, 80 S. Ct. 788. There, the Supreme Court articulated what amounts to a general formula for determining competency in a criminal trial. In *Dusky*, the Supreme Court, quoting from the brief of the solicitor general declared that "the record in this case does not sufficiently support the findings of competency to stand trial." *Id.* at 402, 80 S. Ct. at 788. Further citing from the solicitor general's brief, the *Dusky* Court declared

> that it is not enough for the district court judge to find that "the defendant (is) oriented to time and place and (has) some recollection of events," but that the "test must be whether he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him."

*Id.* at 402, 80 S. Ct. at 788–89.

After *Dusky*, the Supreme Court decided *Pate v. Robinson*, 383 U.S. 375, 86 S. Ct. 836 (1966). In *Robinson*, the defendant had what the Court characterized as "a long history of disturbed behavior." *Id.* at 378–82, 86 S. Ct. at 838–40. At trial, the defense offered four witnesses who testified that Robinson was insane. *Id.* at 383, 86 S. Ct. at 841. The defense,

however, did not make a motion for a hearing to determine competence to stand trial. *Id.* at 384, 86 S. Ct. at 841. The *Robinson* Court held, however, that it would be "contradictory to argue that a defendant may be incompetent, and yet knowingly or intelligently 'waive' his right to have the court determine his capacity to stand trial." *Id.*

The Supreme Court found the evidence in *Robinson* sufficient to require a hearing on the issue. *Id.* at 385, 86 S. Ct. at 842. The *Robinson* Court recognized that the Illinois Supreme Court had declared that the evidence in the case was not sufficient to require a hearing "in light of the mental alertness and understanding displayed in Robinson's 'colloquies' with the trial judge." *Id.* The *Robinson* Court stated that while Robinson's "demeanor at trial might be relevant to the ultimate decision as to his sanity, it cannot be relied upon to dispense with a hearing on that very issue." *Id.* at 386, 86 S. Ct. at 842. The *Robinson* Court determined that there was sufficient doubt as to the defendant's present competency to require a hearing on the issue. *Id.* In *Robinson,* the Supreme Court rejected the notion of a limited remand to determine the competency issue because of the difficulty of such a retrospective determination. *Id.* at 386–87, 86 S. Ct. at 842–43.

Finally, the United States Supreme Court decided *Drope,* 420 U.S. 162, 95 S. Ct. 896. In this case, the defendant was charged with the rape of his wife. *Id.* at 164, 95 S. Ct. at 900. Early on, the defendant filed a motion for a psychiatric evaluation with a psychiatric report attached to the motion. *Id.* The report diagnosed Drope as suffering from "(1) [s]ociopathic personality disorder, sexual perversion[,] (2) [b]orderline mental deficiency[, and] (3) [c]hronic [a]nxiety reaction with depression." *Id.* at 164 n.1, 95 S. Ct. at 900 n.1. No action was taken on the motion. *Id.* at 164–65, 95 S. Ct. at 900. As the trial date approached, counsel filed

a bare bones motion for a continuance stating that "the defendant is not a person of sound mind and should have a further psychiatric examination before the case should be forced to trial." *Id.* at 165, 95 S. Ct. at 900. During trial, Drope's wife testified that her husband was sick and needed psychiatric care. *Id.* at 166, 95 S. Ct. at 901. She also testified that "on the Sunday prior to trial[,] he tried to choke her to death." *Id.* at 179, 95 S. Ct. at 907. During the prosecution's case, the defendant shot himself in a failed suicide attempt and did not appear for trial. *Id.* at 166, 95 S. Ct. at 901. Ultimately, a motion to continue the trial was denied, the defendant was convicted on the rape charge, and the Missouri state courts affirmed the conviction. *Id.* at 166–67, 95 S. Ct. at 901.

The Supreme Court reversed and remanded. *Id.* at 183, 95 S. Ct. at 909. The *Drope* Court emphasized that the combination of the pretrial showing, the testimony at trial, and the defendant's suicide attempt was sufficient to trigger further inquiry. *Id.* at 180, 95 S. Ct. at 908. The Court noted that there were "no fixed or immutable signs which invariably indicate the need for further inquiry to determine fitness to proceed." *Id.* But regardless of whether a pretrial hearing should have been conducted, the *Drope* Court ruled that once the defendant attempted suicide during the course of trial, proceedings should have been suspended until an evaluation could be obtained. *Id.* at 181–82, 95 S. Ct. at 908–09.

The important point here is that the decisions of the United States Supreme Court have not developed in detail precisely what is required to trigger a hearing on the issue of competency to stand trial and further, on what competency to stand trial means. *See United States v. Housh*, 89 F. Supp. 2d 1227, 1229 (D. Kan. 2000) (noting that few cases have given meaning to "rational understanding" under *Dusky*); *State v. Garfoot*, 558 N.W.2d 626, 633 (Wis. 1997) (Abrahamson, C.J., concurring) ("Many

questions remain unanswered: What decision-making abilities are encompassed by the *Dusky* formulation? To what extent do the *Dusky* tests include an accused's appreciation of the trial's significance and his or her own situation as a defendant in a criminal prosecution? What is the relation between the *Dusky* tests and legal rules relating to decision-making by criminal defendants?"). It is clear, however, that the failure to make a motion or the filing of a bare bones motion does not relieve the court of its responsibility to independently determine the issue of competency. *See Drope*, 420 U.S. at 176–77, 95 S. Ct. at 906–07; *Robinson*, 383 U.S. at 384, 86 S. Ct. at 841. Further, the issue of competency is to be determined considering the accumulated factors, but not single factors in isolation. *Drope*, 420 U.S. at 180, 95 S. Ct. at 908. Finally, the apparently rational responses to court colloquies does not provide, standing alone, a basis for denying a hearing on competency if other factors are present. *Robinson*, 383 U.S. at 385–86, 86 S. Ct. at 842.

On the issue of what is meant by "rational understanding," it is clear that mere factual understanding as to time and place displayed in *Dusky* is not sufficient. Any determination of rational understanding must include consideration of *decisional* competence. *See Godinez*, 509 U.S. at 412–13, 415–16 & 415 n.3, 113 S. Ct. at 2693–94, 2695–96 & 2695 n.3 (Blackmun, J., dissenting) (emphasizing the ability of a defendant to make reasoned decisions regarding their representation); *State v. Debra A.E.*, 523 N.W.2d 727, 732 (Wis. 1994) (noting *inter alia* that defendant is incompetent when unable to make decisions committed by law to the defendant "with a reasonable degree of rational understanding"). A leading authority on juvenile competency in court settings has stated that decisional competence involves "the ability to consider the potential consequences of several options, to make subjective judgments about the

desirability and probability of those consequences, and to compare them." Thomas Grisso, *The Competence of Adolescents as Trial Defendants*, 3 Psychol., Pub. Pol'y, & L. 3, 8 (1997) [hereinafter Grisso, *The Competence of Adolescents*].  Restated by another authority, decisional competence means the ability to make choices reserved for the defendant within the criminal justice system such as whether to demand a jury trial, represent oneself, testify, be present, or plead guilty.  Terry A. Maroney, *Emotional Competence, "Rational Understanding," and the Criminal Defendant*, 43 Am. Crim. L. Rev. 1375, 1389–90 (2006) [hereinafter Maroney]; *see also* Elizabeth S. Scott & Laurence Steinburg, *Rethinking Juvenile Justice* 160 (2008) (stating defendants must have "not only [the capacity for] adequate factual and rational understanding, but also the ability to consider alternatives and make a choice in the decision-making process").

The need for decisional competence is especially important for juveniles.  As noted by Grisso and Steinberg, "[m]any of the differences between adolescents and adults have to do with their ability not merely to understand things, but to *use* information to make decisions."  Thomas Grisso & Laurence Steinberg, *Juvenile Competence: Can Immaturity Alone Make an Adolescent Incompetent to Stand Trial*, 9 Juv. Just. Update 1, 14 (2003).

Determining whether a juvenile defendant has sufficient decisional competence for adjudication is not a task subject to quick seat-of-the-pants judgment.  Such determinations require

> a highly particularized inquiry into whether the defendant's perception and understanding of relevant aspects of the world are accurate; whether she is able to engage in appropriately flexible reasoning; and whether she can formulate, express, maintain, and implement choices.

Maroney, 43 Am. Crim. L. Rev. at 1400.

The question in this case is whether such a particularized inquiry should have been ordered by the district court.

**C. Iowa's Approach to Competency in Criminal Proceedings.** Iowa Code section 812.3(1) provides the framework for implementing the due process requirement that a defendant be competent in a criminal proceeding. Iowa Code section 812.3(1) provides that at any stage of a criminal proceeding a competency hearing may be required when the district court finds probable cause that there exist "specific facts showing that the defendant is suffering from a mental disorder which prevents the defendant from appreciating the charge, understanding the proceedings, or assisting effectively in the defense." When a district court orders an evaluation, Iowa Code section 812.4 establishes a timeline for the evaluation.

We have stated there is a presumption that the defendant is competent. *State v. Lyman*, 776 N.W.2d 865, 874 (Iowa 2010), *overruled on other grounds by Alcala v. Marriott Int'l, Inc.*, 880 N.W.2d 699, 708 & n.3 (Iowa 2016); *State v. Rieflin*, 558 N.W.2d 149, 152 (Iowa 1996), *overruled on other grounds by Lyman*, 776 N.W.2d at 873; *State v. Pedersen*, 309 N.W.2d 490, 496 (Iowa 1981). That presumption is determinative, however, only when the evidence is in equilibrium. *Lyman*, 776 N.W.2d at 874; *Rieflin*, 558 N.W.2d at 152; *Pedersen*, 309 N.W.2d at 496.

We have observed that probable cause under the statute exists when a reasonable person would believe there is a substantial question of the defendant's competency. *State v. Kempf*, 282 N.W.2d 704, 706–07 (Iowa 1979). We have relied upon federal precedent declaring that the standard of review is "whether a reasonable judge . . . should have experienced doubt with respect to [the defendant's] competency to stand trial." *State*

*v. Mann*, 512 N.W.2d 528, 531 (Iowa 1994) (quoting *Griffin v. Lockhart*, 935 F.2d 926, 930 (8th Cir. 1991)).

In making the determination regarding whether to order an evaluation, we rely on the totality of circumstances. *Pedersen*, 309 N.W.2d at 495. In making that determination, we have noted that a lawyer's report or professional statement plays an important role. *State v. Einfeldt*, 914 N.W.2d 773, 780 (Iowa 2018). Whether the defendant can communicate effectively with counsel is also a critical factor. *Rieflin*, 558 N.W.2d at 152. Subnormal intelligence is one factor to be considered but does not necessarily require a finding of incompetence. *State v. Stoddard*, 180 N.W.2d 448, 449, 451 (Iowa 1970) (noting IQ scores of 78 and 75 in previous testing, denoting severe mental retardation, was a factor to consider regarding competence). Other factors for consideration include any prior medical opinion of which the trial court is aware, the defendant's apparent irrational behavior, and other demeanor that suggests a competency problem. *Mann*, 512 N.W.2d at 531.

We review whether a trial court should have ordered a competency hearing de novo. *Einfeldt*, 914 N.W.2d at 778; *Mann*, 512 N.W.2d at 531. A trial court's discretion does not play a role in the determination. *Einfeldt*, 914 N.W.2d at 780; *State v. Edwards*, 507 N.W.2d 393, 395 (Iowa 1993).

We have not had many occasions to consider the competency of a juvenile. In *Kempf*, however, we considered whether a competency evaluation should have been conducted of a sixteen year old "of borderline intelligence with emotional development lower than his age." 282 N.W.2d at 709. After canvassing the record, including in-court colloquies, we concluded that a competency hearing should have been ordered. *Id.* at 710. We emphasized in *Kempf* the need to consider the cumulative effect

of various factors in determining whether a competency hearing should be ordered. *Id.*

In applying the above principles, it is important to recognize the preliminary nature of the inquiry. In *Einfeldt,* we noted that it was important that "district court judges not put the proverbial cart before the horse in the competency setting." 914 N.W.2d at 782. Under Iowa Code section 812.3, the district court is not initially called upon to make a determination of competency, but only that the defendant be evaluated regarding the competency issue. *Id.* We cited authorities in *Einfeldt* noting that the threshold for a hearing to determine competency as "not difficult to reach by design" and "very low in order to cleanse all cases of doubts about competence." *Id.* (citing *Blakeney v. United States*, 77 A.3d 328, 398 (D.C. 2013); Richard J. Bonnie, *The Competence of Criminal Defendants: Beyond* Dusky *and* Drope, 47 U. Miami L. Rev. 539, 463 (1993)).

We also addressed the issue of remedy in *Einfeldt.* Because of the difficulties of retrospective reconstruction of competency, we declined to allow a limited remand for the sole purpose of proving the ability of the defendant at the time of trial. *Id.* at 783.

**III. Application of Principles to the Present Case.**

**A. Indicia of Incompetency Present in This Case.** In this case, the record reveals several potential factors to be considered in determining whether to inquire further into the Draine's competence. First, the medical records submitted indicate that Draine had an IQ of 60. Second, the medical records show a history of ADHD. Third, the records show that Draine had a long history of irrational behaviors, cumulating in a diagnosis of ODD. Fourth, it is undisputed that Draine was sixteen years of age at the time of trial. Finally, his lawyer stated that he questioned his client's competency. The question before us is whether these factors in

the aggregate, combined with any other circumstances in "the record[,] contain[] information from which a reasonable person would believe a substantial question of the defendant's competency exists" and so "require[] a hearing on the issue of competency." *Kempf*, 282 N.W.2d at 706.

We first consider the issue of what in the past has been referred to as mental retardation but is now generally identified as intellectual disability.[1]  There is, perhaps, a threshold question of whether an intellectual disability qualifies as a "mental disorder" under Iowa Code section 812.3(1).  I think it does.  The current *Diagnostic and Statistical Manual of Mental Disorders* includes intellectual disability as a mental disorder.  *See* Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 20, 33 (5th ed. 2013) [hereinafter DSM-5] (noting that all neurodevelopmental disorders, of which intellectual disability is one, qualified as mental disorders).  Certainly there is a point when the limitation of a defendant's ability to think rationally, assist counsel, and make decisions reserved to the defendant amounts to incompetence to stand trial.  *See Commonwealth v. Wooten*, 269 S.W.3d 857, 864 (Ky. 2008).  A statute that did not allow consideration of low intellectual ability would run the grave risk of unconstitutionality under applicable due process precedents.

There is reason to believe that Draine has an intellectual disability, and there is evidence in the record that he has an IQ of 60.  The American Psychiatric Association indicates that an intellectual disability is marked

---

[1]We use the phrase intellectual disability to refer to conditions formerly described as mental retardation.  *See State v. Linares*, 393 P.3d 691, 692 n.1 (N.M. 2017) ("We are aware that it is no longer acceptable to describe individuals with developmental disabilities as 'mentally retarded.'  This now-defunct phrase is part and parcel of a rhetoric that dehumanized and delegitimized valuable members of our society.").

by "[s]ignificantly subaverage intellectual functioning: an IQ of approximately 70 or below on an individually administered IQ test," plus impairments in adaptive functioning such as communication, social/interpersonal skills, functional academic skills, self-care skills, self-direction, work, or safety. *See* Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 49 (4th ed., text rev. 2000).[2] Persons with IQ scores of 70 or below often "present difficult assessment and treatment problems with frequently unexplored linguistic and cognitive obstacles." David R. Katner, *The Mental Health Paradigm and the MacArthur Study: Emerging Issues Challenging the Competence of Juveniles in Delinquency Systems*, 32 Am. J.L. & Med. 503, 516 (2006) [hereinafter Katner]. In any event, medical records characterize his intellectual abilities "in the extremely low range" and indicate he demonstrated "poor verbal abstract reasoning and work knowledge skills." Both lower age and lower IQ compound in terms of an individual's level of impairment regarding competency generally, with IQ scores being lower on average among individuals detained or incarcerated than in society generally. *See* Thomas Grisso, et al., *Juveniles' Competence to Stand Trial: A Comparison of Adolescents' and Adults' Capacities as Trial Defendants*, 27 L. & Hum. Behav. 333, 346–50, 356 (2003).

---

[2]Note that, consistent with a general shift in verbiage from "mental retardation" to "intellectual disability," the DSM-5 similarly changes its verbiage to be consistent with changes in the law and the "common use [of the term] by medical, educational, and other professions and by the lay public and advocacy groups." DSM-5 at 33. Additionally, the DSM-5 notes a shift in their delineation in various levels of severity, defining them now "on the basis of adaptive functioning, and not IQ scores, because it is adaptive functioning that determines the level of supports required. Moreover, IQ measures are less valid in the lower end of the IQ range." *Id.* While I accept and note this change, nevertheless we also include the language from previous iteration of the DSM as another indicia that a competency evaluation is required in this case.

I do not regard the presence of evidence of an IQ of 60 as providing some kind of bright line on the question of competency, but it is a red flag. As noted by the Wisconsin Supreme Court,

> The State is correct in that [intellectual disability] in and of itself is generally insufficient to give rise to a finding of incompetence to stand trial. However, a defendant may be incompetent based on [intellectual disability] alone if the condition is so severe as to render him incapable of functioning in critical areas. Thus, the determination of competence is an individualized, fact-specific decision. *It is for that reason that expert testimony regarding a particular defendant's mental capabilities is necessary.*

*Garfoot*, 558 N.W.2d at 631–32 (majority opinion) (citations omitted) (emphasis added). As suggested by *Garfoot*, the caselaw regarding the competence of individuals with intellectual disability is highly contextual and often the subject of expert analysis. *See, e.g.*, *People v. Campbell*, 133 Cal. Rptr. 815, 818, 820 (Ct. App. 1976) (affirming an expert evaluation of defendant, taking into account the diagnosis of mild mental retardation with an IQ range of 69–79, did not render this particular defendant incompetent to aide in their own defense); *State v. Linares*, 393 P.3d 691, 698–700 (N.M. 2017) (affirming finding of incompetence where defendant had IQ of 68, and therefore had an intellectual disability, but also exhibited limited intellectual functioning); *Garfoot*, 558 N.W.2d at 628–29, 633 (affirming trial court finding defendant with IQ of 64 was incompetent when expert testimony supported trial court decision).

But if IQ is not necessarily determinative, neither can it be ignored. IQ consistently is related to competence, with the likelihood of competence declining with lower IQ scores. Geoffrey R. McKee & Steven J. Shea, *Competency to Stand Trial in Family Court: Characteristics of Competent and Incompetent Juveniles*, 27 J. Am. Acad. Psychiatry & L. 65, 69–72 (1999). As has been noted in the literature, juveniles of low intelligence

[are] much less likely to appreciate that the court was proceeding adversely against them, to be able to assist their attorneys with a defense, or to understand and weight the ramifications of the decisions they alone must make (e.g. plea bargaining, testifying).

Geoffrey R. McKee, *Competency to Stand Trial in Low-IQ Juveniles*, 19 Am. J. of Forensic Psychiatry 3, 11 (1998).

It is important to note that the literature also suggests that the impairment caused by intellectual disability is often not recognized by attorneys and the courts.

> According to most commentators, legally significant impairments due to mental retardation are largely unrecognized by attorneys and courts. . . . "[E]fforts that many mentally retarded people typically expend in trying to prevent any discovery of their handicap may render the existence or the magnitude of their disability invisible to criminal justice system personnel." Impairments become visible enough to trigger evaluation, it is thought, mainly when the defendant is also mentally ill or acts in a bizarre or disruptive fashion.

Richard J. Bonnie, *The Competence of Criminal Defendants with Mental Retardation to Participate in Their Own Defense*, 81 J. Crim. L. & Criminology 419, 420–21 (1990) [hereinafter Bonnie] (footnotes omitted) (quoting James W. Ellis & Ruth A. Luckasson, *Mentally Retarded Criminal Defendants*, 53 Geo. Wash. L. Rev. 414, 458 (1985) [hereinafter Ellis & Luckasson]).

The failure to recognize intellectual disability is due in part to the phenomenon called masking. Persons with intellectual disabilities are often shamed by their limitations and go to great lengths to mask it by feigning understanding and comprehension and seeking to appear normal. *See ABA Criminal Justice Mental Health Standard*, standard 7-5.9 cmt., at 318 (noting many mildly and moderately disabled individuals have learned to devote a considerable amount of effort to hide their disability); Morgan

Cloud, et al., *Words Without Meaning: The Constitution, Confessions, and Mentally Retarded Suspects*, 69 U. Chi. L. Rev. 495, 513–14 (2002) (noting that police, lawyers, and judges may not realize that a person who successfully masks his or her ability has a disability); Ellis & Luckasson, 53 Geo. Wash. L. Rev. at 458 (noting many try to prevent discovery of their disability and attempt to "pass" as a neurotypical person).

Because of the above factors, the role of an expert, as pointed out in *Garfoot,* is important in determining the competence of defendants like Draine. A key element to the assessment is the skill and qualifications of the expert. Without expert testimony, however, we are left making a poorly informed guess.

The second factor present in the record is ADHD. Standing alone, it seems clear that in most cases ADHD would not be sufficient to establish incompetence. But if a person who is intellectually disabled also has a history of ADHD, the question becomes more complicated. Could the comorbidity of ADHD and intellectual disability impact competence to make important decisions associated with adjudication like deciding whether to enter into a plea bargain? *See* DSM-5 at 61–63 (noting ADHD substantially affects social function and, in some cases, cognitive functioning as well); David J. Bridgett & Michael E. Walker, *Intellectual Functioning in Adults with ADHD: A Meta-Analytic Examination of Full Scale IQ Differences Between Adults With and Without ADHD*, 18 Psychol. Assessment 1, 10 (2006) (When ADHD is accompanied by a comorbid condition, the cognitive deficit is more pronounced.); Barry C. Feld, *Competence and Culpability: Delinquents in Juvenile Courts, Youths in Criminal Court,* 102 Minn. L. Rev. 473, 519–20 (2017) [hereinafter Feld] (noting juveniles with ADHD may have difficulty concentrating or communicating with attorney and this may compound developmental

incompetence); Erik G Willcutt, et al., *Validity of Executive Functioning Theory of Attention-Deficit/Hyperactivity Disorder: A Meta-Analytic Review*, 578 Biological Psychiatry 1336, 1336 (individuals with severe ADHD suffer cognitive impairments, including deficits in executive and adaptive functioning).

The third factor present in the record is a long history of irrational behaviors, usually involving violent behavior.  The record in this case is replete with outbursts and violent behaviors that appear to be irrational. Draine was diagnosed with ODD.  The medical records demonstrate a history of anger, paranoia, and even violence toward people who are trying to help him, including his mother, staff, and his attorney.

Both Draine's diagnosis of ODD and his documented behavior suggest problems with adaptive behavior, a significant element in the diagnosis of intellectual disability.  And again, the question is whether the interaction of his intellectual disability, ADHD, and ODD increases the risk of incompetency sufficient to require further inquiry.  *See* Thomas Riffin, *Competence to Stand Trial Evaluations with Juveniles*, 32 *New Eng. J. on Crim. & Civ. Confinement* 15, 18–19 (2006).

In considering the violent history of Draine, an African-American juvenile, it is important to be vigilant that decision-making is not impacted by implicit racial bias.  As noted by one commentator,

> [M]ental illness among minority youth often goes undiagnosed or misdiagnosed because the symptoms they exhibit tend to have an "aggressive tenor," which cause the youth immediately to be perceived simply as threatening instead of potentially subject to undiagnosed and untreated symptoms of mental illness.

Kasey Corbit, Note, *Inadequate and Inappropriate Mental Health Treatment and Minority Overrepresentation in the Juvenile Justice System*, 3 Hastings

Race & Poverty L.J. 75, 83 (2005); *cf.* Kristin Henning, *Criminalizing Normal Adolescent Behavior in Communities of Color: The Role of Prosecutors in Juvenile Justice Reform*, 98 Cornell L. Rev. 383, 383 (2013) (finding that "scientifically supported notions of diminished culpability of youth are not applied consistently across races" (emphasis omitted)).

The fourth factor in the record is the defendant's age. At the time of trial, Draine was sixteen. He had notable mental capacity problems early in his life. One of the criteria for an intellectual disability is the onset of disability at an early age. *See* DSM-5 at 33 (noting intellectual disability has its onset "during the developmental period . . . includ[ing] both intellectual and adaptive functioning deficits in conceptual, social, and practical domains").

Further, as has been recognized, adolescent brain development lags behind adults. *See Roper v. Simmons*, 543 U.S. 551, 569–70, 125 S. Ct. 1183, 1195–96 (2005) (finding that due to the adolescent brain's lack of maturity, juveniles have an underdeveloped sense of responsibility and are reckless and impulsive). Moreover, "[n]o recent data provide reason to reconsider the Court's observations in *Roper* about the nature of juveniles. . . . [D]evelopments in psychology and brain science continue to show fundamental differences between juvenile and adult minds." *Graham v. Florida*, 560 U.S. 48, 68, 130 S. Ct. 2011, 2026 (2010); *see Miller v. Alabama*, 567 U.S. 460, 471–73, 132 S. Ct. 2455, 2464–65 (2012) (affirming *Roper* and *Graham*, based "not only on common sense—on what 'any parent knows'—but on science and social science as well"); *State v. Sweet*, 879 N.W.2d 811, 815–16 (Iowa 2016) (noting the prevailing scientific view on brain maturation, that "up until the age of about twenty-five there is a period of rapid change or development in the adolescent brain. . . . [including in] impulsiv[ity], and as people get older, '[they] learn

. . . the skills to inhibit behavior' "); *State v. Null*, 836 N.W.2d 41, 54–56 (2013) (noting favorably the *Roper*, *Graham*, and *Miller* precedents, along with the hard and social science underlying their rationales). While *Roper* and its federal and state progeny generally deal with concepts of cruel and unusual punishment, the science behind these cases is also germane in other criminal justice settings. *See J.D.B. v. North Carolina*, 564 U.S. 261, 271–75, 131 S. Ct. 2394, 2402–05 (2011) (recognizing developmental psychology in context of *Miranda* warnings and false confessions); *see generally* Lindsay C. Malloy, et al., *Interrogations, Confessions, and Guilty Pleas Among Serious Adolescent Offenders*, 38 L. & Hum. Behav. 181 (2014) (finding youth especially susceptible to confession, both true and false, when faced with interrogation techniques, and suggest special safeguards when interacting with youth who are suspects). Draine was sixteen at the time of trial, an age that had been suggested as the threshold for mandatory competence evaluation for juveniles. *See* Stephen Bell, Tate v. State*: Highlighting the Need for a Mandatory Competency Hearing*, 28 Nova L. Rev. 575, 601–03 (2004) (suggesting under the age of sixteen for mandatory evaluations).

Admittedly, we are not dealing with a very young defendant that some authorities believe should be presumed incompetent. *See* Grisso, *The Competence of Adolescents*, 3 Psychol., Pub. Pol'y, & L. at 23 (suggesting a "legal presumption of incompetence to stand trial for youths younger than 14, when they face proceedings that may lead to criminal adjudications (including juvenile court transfer hearings)"). Yet, here we are dealing with a juvenile that also appears to have an intellectual disability as reflected by a low IQ, which is potentially compounded by additional mental disorders (ADHD and ODD). There is reason to believe that the cognitive development of children with intellectual disabilities lags

behind the cohort generally. Erika Fountain & Jennifer L. Woolard, *The Capacity for Effective Relationships Among Attorneys, Juvenile Clients, and Parents*, 14 Ohio St. J. Crim. L. 493, 504 (2017) (noting impairment arising from low IQ is greater for adolescents than young adults); Thomas Grisso, *Dealing with Juveniles' Competence to Stand Trial: What We Need to Know*, 18 QLR 371, 379 (1999) [hereinafter Grisso, *Dealing with Juveniles' Competence*] (noting intellectual disability "often produces a lag in youths' cognitive and social development, requiring a longer time before their capacities mature to a level typical for them in their adulthood"); Katner, 32 Am. J.L. & Med. at 507 (postulating as to the overlapping impact of developmental immaturity due to age and developmental immaturity due to mental disorders). This is particularly important if the defendant is not simply to understand key issues facing him in the criminal process but to appreciate the consequences of choices. Further, aside from the combination of intellectual disability and immaturity, some studies suggest that fifteen to seventeen year olds were not the equivalent of adults in understanding trial proceedings. *See* Geoffrey R. McKee, *Competency to Stand Trial in Preadjudicatory Juveniles and Adults*, 26 J. Am. Acad. Psychiatry Law 89, 95–97 (1998); Jeffrey C. Savitsky & Deborah Karras, *Competency to Stand Trial Among Adolescents*, 74 Adolescence 349, 355 (1984).

In any event, while some experts conclude that the cognitive development of sixteen year olds is often the equivalent of adults, psychosocial development still lags behind. Psychosocial development includes processes such as responsibility, perspective, and temperance. *See* Elizabeth Caufmann, et al., *How Developmental Science Influences Juvenile Justice Reform*, 8 U.C. Irvine L. Rev. 21, 23–26 (2018) (finding that despite advancement in cognition, psychosocial maturity is delayed due to

a so-called "immaturity gap"). Such psychosocial factors impair an adolescent's decisional competence. *See* Brian G. Sellers & Bruce A. Arrigo, *Adolescent Transfer, Developmental Maturity, and Adjudicative Competence: An Ethical and Justice Policy Inquiry*, 99 J. Crim. L. & Criminology 435, 445–51 (2009) (exploring the impact of a variety of psychosocial factors on competence and noting that it may make no functional difference whether incompetence is due to mental illness or to psychosocial immaturity); Laurence Steinberg, et al., *Age Differences in Future Orientation and Delay Discounting*, 80 Child Dev. 28, 39–41 (2009) (finding developmental deficits in adolescents compared with adults, especially related to understanding and consideration of future consequences); Twila A. Wingrove, Note, *Is Immaturity a Legitimate Source of Incompetence to Avoid Standing Trial in Juvenile Court?*, 86 Neb. L. Rev. 488, 498–502, 505–06 (2007) [hereinafter Wingrove] (noting that juveniles are psychosocially impaired as compared to adults and that some psychosocial factors clearly implicate legal competence of juveniles).

It may be argued that the limited development of a juvenile is not a "mental disorder" under the statute. It would seem odd, however, to not consider the age of a criminal defendant in determining competency.

Consider, for instance, the reasoning in an unpublished decision by the Iowa Court of Appeals:

> Limiting incompetency in delinquency proceedings to cases in which the child is incompetent by reason of a "mental disorder" would fail to recognize that a juvenile's inability to appreciate the charge, understand the proceedings, or assist effectively in the defense may be the result of immaturity, lack of intellectual capacity, or both. We conclude that limiting determinations of incompetency in juvenile cases to those cases in which the inability to appreciate, understand, and assist is based on a "mental disorder" would offend rights to due process.

*In re A.B.*, No. 05–0868, 2006 WL 469945 at *3 (Iowa Ct. App. Mar. 1, 2006). The reasoning of *In re A.B.* was expressly adopted by the court of appeals in a published opinion. *See In re J.K.*, 873 N.W.2d 289, 295–96 (Iowa Ct. App. 2015); *see also In re Hyrum H.*, 131 P.3d 1058, 1061–62 (Ariz. Ct. App. 2006) (permitting developmental psychology to be considered in analysis of "competence" under statute); *Timothy J. v. Super. Ct.*, 58 Cal. Rptr. 3d 746, 751–52 (Ct. App. 2007) (holding no requirement of mental or developmental disability under applicable statutes); Feld, 102 Minn. L. Rev. at 522 (recognizing the need for courts to use "special procedural safeguards . . . to protect [juveniles] from improvident decisions" on the basis that "formal equality [in the treatment of adults and juveniles] results in practical inequality"); Wingrove, 86 Neb. L. Rev. at 506 (implicating psychosocial immaturity in the totality of juvenile competency considerations). *But see State v. Swenson-Tucker*, No. 32944-1II, 2006 WL 401699, at *4–5 (Wash. Ct. App. Feb. 22, 2006) (finding that under Washington's legal framework, incompetency arises only as a "result of mental disease or defect" and not from immaturity). A somewhat different approach was taken by the Indiana Supreme Court. In *In re K.G.*, 808 N.E.2d 631, 638 (Ind. 2005), the Indiana court held that the statute defining competence simply did not apply to juveniles.

In this case, the question of whether developmental issues fall within the scope of a "mental disorder" is irrelevant. Here, it appears the defendant has an intellectual disability, certainly a mental disorder under the statute, which is then aggravated by the lack of psychosocial development as a sixteen year old. *See* Grisso, *Dealing with Juveniles' Competence*, 18 QLR at 379 (noting mental retardation "often produces a lag in youths' cognitive and social development, requiring a longer time

before their capacities mature to the level that will be typical for them in their adulthood").

The fifth factor is an attorney's professional statement regarding the competency of his client. Here, the attorney's statement was minimal. The attorney declared that there was a question of competence, noting that recently the client confused him for another attorney representing the client in another juvenile proceeding. The attorney also expressed concern about violent outbursts from his client.

The attorney's statement only offers modest additional support, but as noted in *Drope*, the fact that a lawyer's advocacy falls short of appropriate assistant to the trial court is not fatal to the question of whether a competency hearing should be afforded. *See Drope*, 420 U.S. at 177, 95 S. Ct. at 906. Further, as the literature amply demonstrates, lawyers themselves are often not fully aware of the competence limitations of the juvenile defendants. *See* Ellis & Luckasson, 53 Geo. Wash. L. Rev. at 493 (noting that "the limited ability of most lawyers to recognize mental retardation in their clients has been well documented").

It is true that the defendant responded to colloquies in court. But Draine's minimal responses to the court's questions does not demonstrate decisional competence. For example, in *Pritchett v. Commonwealth*, 557 S.E.2d 205, 207 (Va. 2002), a forensic psychologist interviewed an intellectually disabled defendant about a forty-word story by asking a series of leading questions. Some of the information was not contained in the story, but the defendant provided an incorrect belief that he knew the answers. *Id.* Indeed, when the defendant was told "he needed to try to answer as best he could," the forensic psychologist testified,

> [The defendant] switched his answers thinking from the
> negative feedback that I was not happy with him so therefore

. . . not only [is he] answering questions that weren't really in the story, but now he's changing his answers based on that slight negative feedback that I gave him.

*Id.* As noted by Professor Bonnie decades ago, determining the competence of a person with an intellectual disability "requires careful assessment in order to assure both that the admissions embedded in the plea are reliable and that the defendant understands the nature and consequences of the plea." Bonnie, 81 J. Crim. L. & Criminology at 444. Further, Professor Bonnie warned that reliance on routine plea colloquies will not be adequate in determining competence:

> Routine attorney-client interactions and routine plea colloquies will not do the job.
>
> At a minimum, when a plea is proffered by a defendant [with an intellectual disability], the judge must assure that an adequate clinical evaluation has been conducted, and must affirmatively seek to satisfy himself or herself concerning the factual basis for the plea and the defendant's understanding of its consequences.

*Id.*

An examination of the transcripts shows that the questions were leading and generally called for yes or no answers. Draine answered the vast majority of the questions, thirty-one to be exact, with one syllable answers. One question was ninety-three words long and produced a one-syllable answer. It might have been a satisfactory plea colloquy when competence was not an issue. But the colloquy itself does not tell us much about Draine's mental abilities or competence to stand trial. Even if it did, the teaching of *Robinson* is that in-court behavior cannot trump a medical history suggesting there might be a problem with the competence of the defendant. 383 U.S. at 385, 86 S. Ct. at 842.

As indicated above, persons with intellectual disability often have become skilled in masking their disability because of the sense of shame

they attach to it. At a minimum, I think we can at least question whether this defendant had a good grasp of many of the questions posed, one of which contained ninety-three words. *See Tate v. State*, 864 So. 2d 44, 50 (Fla. Dist. Ct. App. 2003) (finding competency hearing was required despite plea colloquy in which defendant acknowledged the terms of their potential plea); *Commonwealth v. Smith*, 324 A.2d 483, 489 (Pa. Super. Ct. 1974) (noting that despite the appearance from the colloquy that defendant may have had an understanding of the charges against him, and subsequently, of the possible consequences of a conviction, this was not enough to support a finding of competency). Indeed, the United States Supreme Court in *Robinson* reversed the Illinois Supreme Court which relied upon the apparent rationality of the defendant's in-court behavior in refusing to hold a hearing on the defendant's competence. 383 U.S. at 385–86, 86 S. Ct. at 842–43 (citing *People v. Robinson*, 174 N.E.2d 820, 823 (Ill. 1961)).

It is also important to avoid the stereotypical belief that a person with intellectual disability or mental illness is likely to be a "ticking time bomb." As with all stereotypes, such an assertion is overbroad. Further, the risk that a defendant will continue to reoffend is wholly irrelevant in determining competency to stand trial. *In re Williams*, 687 N.E.2d 507, 512 (Ohio Ct. App. 1997).

**B. Determination of Requirement of Competency Evaluation.** Our caselaw properly holds that the question of whether to order a competency hearing is subject to de novo review by this court. *Einfeldt*, 914 N.W.2d at 780; *Mann*, 512 N.W.2d at 531. Further, we are to consider the cumulative effect of all circumstances that indicate doubt about the mental competency of the defendant. *Kempf*, 282 N.W.2d at 707. We are only to look for reasonable doubt, not a definitive determination of

incompetency. *Einfeldt*, 914 N.W.2d at 779; *see also Tate*, 864 So. 2d at 51 (noting that the key issue is whether the defendant may be incompetent, not whether the defendant is incompetent); *ABA Criminal Justice Mental Health Standards*, standard 7-4.2(a) cmt., at 178 (noting "[the court] need not be convinced that a defendant is incompetent to stand trial before ordering an evaluation, because that is the objective of an evaluation").

Based on the above five factors, I conclude that the evidence before the district court was sufficient to give rise to a substantial issue as to whether Draine had the requisite decisional competence to stand trial. The combination of factors in the aggregate are simply too weighty to allow a decision to the contrary based on no reasonable doubt. While Draine may have had a degree of factual understanding of his situation, such understanding is insufficient to overcome the other parts of the record that give rise to a substantial doubt regarding his decisional competency. The lack of firm evidence of decisional competency is particularly troublesome in the plea-bargain setting, where decisional competence described in *Godinez* and *Debra A.E.* is critical to a fair outcome.

**C. Conclusion.** Under the circumstances, I conclude that there was a substantial question as to the competence in Draine. As a result, I would reverse the district court and remand the case to the district court for proceedings consistent with *Einfeldt*.